# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-00418-COA

**DOUGLAS McCARTY**                                                     **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                   **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 04/01/2021 |
| TRIAL JUDGE: | HON. CLAIBORNE McDONALD |
| COURT FROM WHICH APPEALED: | LAWRENCE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ALEXANDRA RODU ROSENBLATT |
| DISTRICT ATTORNEY: | HALDON J. KITTRELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 06/28/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE BARNES, C.J., WESTBROOKS AND EMFINGER, JJ.

### BARNES, C.J., FOR THE COURT:

¶1. A Lawrence County Circuit Court jury found Douglas McCarty guilty of aggravated assault (choking), kidnapping, and rape. He was acquitted of the remaining count of being a felon in possession of a firearm. The trial court sentenced him as a habitual offender to life imprisonment for each conviction, with the sentences to be served consecutively in the custody of the Mississippi Department of Corrections (MDOC) without eligibility for parole.

¶2. McCarty, represented by the Office of Indigent Appeals, contends on appeal that he is entitled to a new trial (1) under the doctrine of retroactive misjoinder and (2) due to the admission of improper character evidence. McCarty has also filed a pro se supplemental

brief, raising various other issues.  Finding no error, we affirm.

## SUMMARY OF FACTS AND PROCEDURAL HISTORY

¶3.     McCarty was arrested and charged with brutally assaulting, kidnapping, and raping his estranged wife "Penny"[1] on July 12, 2018.  Just days prior, the couple had signed an agreed complaint for divorce, and the Lawrence County Justice Court had entered an ex parte domestic protection order against McCarty.  On December 27, 2018, a Lawrence County grand jury indicted McCarty on the following counts:

> Count I: Aggravated Assault (choking); Count II: Aggravated Assault (extreme indifference); Count III: Possession of a Weapon by a Convicted Felon (Browning twelve-gauge shotgun); Count IV:  Possession of a Weapon by a Convicted Felon (Winchester rifle); Count V: Armed Robbery; Count VI: Kidnapping; and Count VII: Rape.

At the State's request, the trial court later entered an order of nolle prosequi as to Counts II and V of the indictment.

¶4.     On August 6, 2020, the trial court held a motion hearing on the defense's request for Penny's medical records.  The defense argued that the medical records were necessary to establish whether Penny had a propensity for "blacking out" in an effort to explain her bruises from the day in question.  The circuit judge ordered that the medical records "be produced to the [c]ourt for *in camera* review to determine the relevancy to the defense."

¶5.     On August 26, 2020, the parties agreed to stipulate that McCarty had a "prior conviction" for purposes of the two counts of possession of a weapon by a felon.  The defense also filed a motion in limine to exclude Penny's treating physician, Dr. Ramiro

---

[1] A pseudonym has been used to protect the victim's identity.

2

Montalvo, "from opining that [Penny] suffers from posttraumatic stress disorder." The trial court denied the defendant's motion in limine on December 21, 2020. Subsequently, the court granted the State's motion to amend the indictment to charge the defendant as a habitual offender under Mississippi Code Annotated section 99-19-83 (Rev. 2015).

¶6.     Another hearing was held to address the defendant's motion to sever the counts. The trial court severed Count IV (possession of a weapon by a felon) from the indictment, as that particular gun was never displayed or used in the commission of the other charged crimes. The court further held in its order, "The Court shall also issue a limiting instruction to the jury as to the purpose of admission of [d]efendant's prior felony conviction in relation to Count III."

¶7.     At the same hearing, the State moved "to admit evidence of prior incidents of domestic violence . . . to show the defendant's intent, motive, and a common scheme" under Mississippi Rule of Evidence 404(b). The State specifically referenced three domestic incidents between the couple that had occurred in the weeks leading up to July 12, 2018. The trial court concluded that the evidence of these three incidents, as well as the ex parte protective order, would be admissible for this purpose. The court also noted that a jury instruction would be given to "caution that the above-listed evidence [would not be] admitted to prove the [d]efendant's character or that he acted in accordance with his character by allegedly committing the crimes for which he stands trial."[2]

¶8.     The jury trial was held March 9-12, 2021. Defense counsel reasserted the motion to

---

[2] For the sake of brevity, we have not mentioned those pretrial motions and hearings, as well as trial court rulings, that are not relevant to the issues raised on appeal.

sever the remaining felon-in-possession-of-a-weapon count, which the trial judge denied. Lawrence County Sheriff Ryan Everett testified that Jeff Farnham, Penny's landlord, contacted his office on July 12, 2018, concerned for Penny's safety. Farnham had seen McCarty at the house that day and knew he was not supposed to be there. Sheriff Everett noted that the sheriff's office previously had been dispatched to the address for domestic disturbances. Law enforcement went to the home after Farnham's call, but no one was there. Meanwhile, Penny's daughter had also talked with law enforcement and had expressed concern for her mother's safety. Recalling the prior domestic incidents, Sheriff Everett believed exigent circumstances existed, so he got Penny's cellular carrier to "do a phone tower ping" in an effort to locate her. He also issued a BOLO ("be on the lookout") notice to neighboring jurisdictions but was not successful in locating either McCarty or Penny.

¶9.    At approximately midnight, Penny was located at her residence, and Farnham drove her to the sheriff's office. Sheriff Everett testified that Penny "was in total hysterics . . . scared to death, frightened." He was "haunt[ed]" by her appearance, noting that "she had taken a beating like I had never seen a man take a beating." Penny was sent to the hospital for a sexual-assault examination. Shortly thereafter, McCarty was taken into custody. During McCarty's interview, McCarty and former Under Sheriff Brian Rayburn got into a heated verbal exchange. Sheriff Everett said that Rayburn, who had been present during Penny's interview, told McCarty, "[I]f you weren't in handcuffs[,] I'd whip your f**king a** my god**** self." McCarty jumped out of his chair, and Rayburn shoved him, causing McCarty's head to hit the drywall. Sheriff Everett "totally condemn[ed]" the altercation.

4

McCarty was transported to the hospital for examination and for a suspect-sexual-assault kit to be used.

¶10. Sheriff Everett testified as to the evidence obtained during the investigation, including a "loaded and locked" shotgun with "two live rounds chambered in the barrel" recovered from the trunk of Penny's car. Due to Penny's emotional state at that time, she was allowed to return two weeks later to give a supplemental written statement regarding the incident. Sheriff Everett noted that Penny still had "visible marks" and "was still an emotional train wreck." On cross-examination, Sheriff Everett said that Penny told him McCarty had tied up her ankles with a vacuum cleaner cord and then went outside to get a shotgun from her car.[3]

¶11. Deputy Anthony Sims testified that he was dispatched on June 15, 2018, in response to a 911 call Penny had made, in which she claimed that McCarty had doused himself with gasoline and had threatened to set himself on fire. Deputy Sims observed that McCarty had "blood-shot eyes" and noticed that a "strong odor of intoxication [was] coming from his breath of alcohol." He said Penny appeared "upset and fearful." Deputy Sims acknowledged that when he interviewed Penny on June 15, she did not say that McCarty had threatened her. Based on information from Penny's statement, Deputy Sims "looked in the trunk of her car to see did she have a weapon." On July 12, 2018, Deputy Sims received the BOLO call for Penny and McCarty in a vehicle.

¶12. Margaret Walker testified that she had worked with her boss Penny for approximately

---

[3] According to Penny's testimony, *see infra* ¶¶22, 28, this firearm was a Browning shotgun belonging to her father.

twenty-seven years. Walker had never known Penny to faint or pass out while at work. Walker and Penny were working at a local nursing home on July 10, 2018, when McCarty came into the building. Penny told him that he could not be there and "led him out the door." Walker followed them out because Penny appeared to be "scared" of McCarty. After McCarty would not leave, another co-worker called law enforcement.

¶13. Farnham testified that he began renting the home to Penny in 2016. Farnham was aware that Penny had a restraining order against her husband and that McCarty was not supposed to be at the house. On the afternoon of the incident, Farnham saw Penny turning into her driveway, so he "messaged her about cutting that grass . . . on Sunday," but she did not respond, which he found unusual. Farnham sent two more messages with no response from Penny.

¶14. "[B]othered" by her failure to answer his texts, Farnham drove to the house. He observed through an open window blind that McCarty had Penny "pressed to the wall with his hand in her face." When Farnham knocked, McCarty "became alarmed[,] . . . jumped back[,] . . . opened the door[, and] . . . said, 'There isn't anything going on. We ain't fighting.'" McCarty walked outside, and Farnham told him that he wanted to cut the grass on Sunday. Farnham further testified:

> He came out the door, went around me, behind me, and went in her car. And as he's looking through the car for, I do not know what, I looked back into the open door. She turns to me and says, call the law, call the law. She's mouthing, call the law, call the law.
>
> And when she turned, this eye was black, this cheek was black.

Farnham drove home and called the sheriff's office. He reported that Penny and McCarty

were at the rental property and "that it appeared to me that she had been beaten." He also sent a Facebook message to Penny's daughter. A few hours later, Farnham went back to the house to see if her vehicle was there. A few minutes later, Penny drove up. She was "disheveled," and her "right eye was black and bruised," so Farnham took her to the sheriff's office. On cross-examination, Farnham acknowledged that McCarty had been living at the house for approximately one month prior to the incident. Farnham noted that when McCarty went to the vehicle, he looked inside the interior of the vehicle but not the trunk.

¶15. Stephanie Langston, a registered nurse and certified "Sexual Assault Nurse Examiner" at Lawrence County Hospital, performed Penny's sexual-assault examination during the early morning hours of July 13, 2018. She testified that Penny's hospital records indicated that the treating physician ordered "CT scans of the head, the C spine, the face, the thorax, which is the chest, the abdomen, pelvis." Langston further remarked that Penny had "severe swelling of the left side of her face." She further noted that Penny's left eye was swollen shut and that "[s]he had multiple contusions" and "some scratches."

¶16. Langston testified as to what Penny told her: "She had been threatened with a flashlight and a gun. And he had hit her with his fist. She had been grabbed and was held around her neck. He tied her up with electrical cord and string, choked her around her neck, and sat on her back." Penny also told Langston that McCarty "penetrated her with his penis during the assault[,] . . . placed his mouth on her genitals[,] and he forced his penis in her mouth." Langston testified that during the exam, Penny was "very subdued, crying on and off."

7

¶17. Langston was questioned about Penny's prescribed medications. Langston noted that some were for blood pressure and blood sugar, including one for insulin injections. Langston explained, however, that the type of needle used for the insulin injection "normally does not leave any type of bruising." The defense showed Langston more recent photographs of Penny, and Langston did note that Penny had some redness and "some obvious discoloration" on her face.

¶18. Jessica Walters, Penny's adult daughter from her previous marriage, testified that she "wasn't allowed to see my mom very much because of [McCarty's] being so controlling." On July 12, 2018, Penny had dropped by to see Jessica at work in Brookhaven "between 4:30 and 5:00 p.m." Penny asked Jessica "to call her when [she] got off work" because "[s]he was very scared of what [McCarty] might . . . do to her." Although Jessica tried to call her mother several times, Penny did not answer. At 7:16 p.m., Farnham sent Jessica a Facebook message to call him. Knowing "something bad was wrong," Jessica began driving to Lawrence County. At one point, Penny's phone picked up, and Jessica "could hear mumbling of them talking back and forth on the phone, but it was very sporadic." When Farnham brought Penny to the sheriff's office, Jessica noted that her mother "could not get out of the car" and "looked like she was severely beaten." Jessica said that since the incident, Penny "has very bad trust issues" and is "scared to be alone."

¶19. Joseph Heflin, a forensic biologist specializing in DNA analysis, testified regarding the testing results from the sexual assault kits. When asked if the sperm cells found in Penny's vaginal swab were those of McCarty, he replied, "I would say [that] unless Douglas

8

McCarty has an identical twin, that it was his DNA on these swabs."

¶20. On the third day of the trial, the State called Dr. Montalvo, Penny's treating physician, who testified that he had known Penny for twenty years. A copy of Penny's medical records were introduced into evidence over the defense's objection. Dr. Montalvo said that Penny came to see him on July 19, 2018, to discuss the "assault." She told Dr. Montalvo that McCarty said he "intended to murder her" and that "[s]he had experienced a loss of consciousness at moments while being choked." Dr. Montalvo noted in his exam that the bruising on her body was "yellowing," which "you start to see five to seven days after a bruise." When questioned whether the bruises would be "consistent with falling on . . . a coffee table," he replied, "It would not." Dr. Montalvo asserted, "It's [a] pretty, pretty good beating that she took. And it's consistent with that, a pretty good beating." He also stated that Penny did not have any condition that would cause her to bruise more easily.

¶21. Penny testified that she had been a former schoolmate of McCarty's and had reconnected with him through Facebook. They began dating in October 2015 and were soon married in December 2015. A week later, she "knew [she] had made a big mistake." She said that McCarty "drank a lot" and was "very verbally and emotionally abusive." He would leave home "for hours and hours" and sometimes days, despite being unemployed. When McCarty was home, he was very controlling. If she did not come directly home after work, he would call her phone incessantly. If Penny did not answer her phone, McCarty would send her "horrible messages" accusing her of infidelity. McCarty also did not like for Penny to visit her family. Penny said that as the marriage went on, he began pushing her around,

breaking ceiling lights, and punching holes in doors and walls. Regarding their sex life, Penny said he was "very rough."

¶22. The couple separated in May 2018. A month later, on June 13, Penny called 911 after McCarty came to the house, began pushing her around, and demanded her car keys. She noted that the trunk of her car contained guns she had inherited from her father. The redacted audio recording of the 911 call was played for the jury. She said McCarty came to the house two days later on June 15, 2018. He had been drinking and told Penny that his vehicle had run out of gas up the road. Penny reluctantly agreed to drive him to get gas for his car. On the way, McCarty "talked nonstop" about leaving town, and he even took off his wedding band. McCarty then told Penny "that he thought the best way to die would be to burn alive, because that way you would feel all the pain and . . . he would suffer for all the pain he had caused me." Once they arrived at his truck, Penny testified that McCarty "took the gas can and he started pouring it over his head and all on his body." Penny screamed at McCarty, "asking him to stop," and she called 911. When emergency responders arrived, McCarty ran and hid nearby. He was discovered and taken into custody. Penny told Deputy Sims that there were guns in her car, and the deputy examined them. She said McCarty was aware of the guns in her trunk and "would look at them frequently."

¶23. Penny had an attorney draft a joint complaint for divorce on the ground of irreconcilable differences, which both she and McCarty signed on July 2, 2018.[4] When he signed the papers, she said McCarty was initially "content" because he thought they could

---

[4] The couple's divorce was finalized in September 2018.

10

work through their problems and withdraw the petition. However, McCarty became "more threatening" to Penny, so she also obtained an ex parte emergency-domestic-abuse protective order against McCarty. The order was issued on July 6, 2018, without notice to McCarty. The next day, on July 7, McCarty visited Penny's place of employment and would not leave when asked. When she told him about the order, "[h]e got angry." Law enforcement was called, and McCarty was taken into custody where he was officially served with the protective order. A hearing for the protective order was scheduled for July 13.

¶24. On the morning of July 12, 2018, Penny went outside to walk her dogs when she heard a voice behind her; it was McCarty saying, "You don't need to do that," as he was walking out of her outdoor laundry room. "[T]errified," Penny told him he could not be there. He followed her into the house and asked for food. She gave him Pop-Tarts and he left, walking down the road. On the way to work, she saw McCarty hitchhiking. She called a sheriff's deputy when she got to work to alert them about the interaction.

¶25. Penny said that after she got home after work, she was walking down the hallway when McCarty grabbed her from behind and said, "I got you now, you bitch." Ignoring her pleas to let her go, McCarty punched her in the face, knocking her to the ground. At that point, she "couldn't say or do anything." McCarty turned Penny over on her stomach, got on her back and put his forearm around her throat, choking her. Gasping for air and seeing spots, Penny went limp. This process was repeated several times. Penny testified, "I knew without a doubt that I was going to die that day."

¶26. Eventually, McCarty stopped choking her, and he tied Penny's ankles with a vacuum

11

cleaner electrical cord. Penny, whose left eye was swollen shut, could barely move. She said McCarty went into the kitchen, and she attempted to untie her ankles. McCarty came back with a "big black flashlight like the law officers use" and got her off the floor. McCarty dragged Penny into the bedroom, put her on the bed, took off her clothes, and "held that flashlight at [her]." McCarty then forced Penny to perform fellatio on him. Not happy with "how [she] was doing it," he "hit [her] on the head with the flashlight," and "said, 'Just forget it.'" McCarty then performed "oral sex" on her. Afterward, McCarty inserted his penis into her vagina and ejaculated.

¶27. McCarty told Penny to bathe herself afterward "so there wouldn't be any traces of him." He also cleaned her fingernails with a scrub brush. After he allowed her to dress, McCarty took her to the den and tied her hands up with "hay string." McCarty demanded money from Penny and a credit card. She complied, but he later returned the card to her. Penny said McCarty "seemed just angry, frazzled, because he didn't know what to do with me."

¶28. At that point, Farnham knocked on the door. Penny reminded McCarty that Farnham knew she was home, so McCarty let her answer while he hid behind the door. As she opened the door, McCarty said, "Don't let him see your face." Farnham informed Penny that he planned on cutting the grass the next day. Penny testified that she "mouthed the words to Jeff [']help me['] because I knew that was my only chance." Farnham replied, "Okay," and left. According to Penny, McCarty then went outside and got her father's Browning shotgun out of the car. McCarty loaded the shotgun in front of her and said they had to leave because

12

Farnham was sure to call someone. Penny knew her daughter had been trying to call her because her Fitbit device was buzzing. McCarty and Penny got in the car. Penny said McCarty put the shotgun on the back seat behind her and began driving toward Columbia, Mississippi. He also placed a butcher knife on the dashboard. Penny testified that McCarty repeatedly said, "All I know to do [is] to take you to the Coast and . . . dump you on the Coast."

¶29. At some point, McCarty drove through a curve in the road, and the knife fell onto the passenger side floorboard. Penny pushed the knife under the seat with her foot. Penny did not grab the knife because she was too "beat up." In Columbia, McCarty stopped at a liquor store and parked the car at the front door, so Penny felt she could not leave. She said that McCarty "started drinking liquor nonstop." They continued driving toward Hattiesburg. Penny asked McCarty to let her out because her son lived nearby, but he "said no."

¶30. After a brief stop in Hattiesburg, McCarty headed back to Monticello, saying they needed to come up with a story to explain her injuries. He told her to say that she had passed out and hit her face on the coffee table, and she assured McCarty that she would. Once they reached Monticello, McCarty drove to the house of a friend—Jason Ard. McCarty then told Penny that he would let her go, call her in a couple of days, and they could "leave and go away somewhere and start over." Penny drove her car home, and Farnham drove her to the sheriff's office where she met her daughter. Penny gave a statement about what had happened and then sought treatment at the hospital. Penny said that since the assault, "I'm broken. I go to work. I go home. Everything stays locked up. Don't go anywhere at night.

I'm scared to death of a man, because you just never know."

¶31. During cross-examination, Penny said that while they were driving around, she convinced McCarty to move the shotgun from the back seat to the trunk because she knew he was a felon. She admitted that in one of her statements to police, she mentioned that McCarty left the car running at a convenience store in Hattiesburg and had told her she could leave.

¶32. The defense moved for a directed verdict on the remaining four counts, which the trial court denied. McCarty testified that he had "pretty much loved [Penny] all [his] life." McCarty claimed that Penny was jealous of McCarty's female friend Melissa, who had loaned him money before he met Penny. On one occasion, he claimed that Penny got "mad as hell and she told me that she would kill me and my little whore." McCarty said that her jealousy was the reason for the divorce.

¶33. McCarty admitted that he left their house in February 2018 but insisted that he and Penny continued to have sexual relations after that, including right after the "gas-can" incident in June. McCarty also denied pouring gas over his head; rather, he claimed that he had accidentally spilled some gas on his pants. He did acknowledge that he had been drinking. Regarding the incident at Penny's place of employment, McCarty said he only went there "to tell her that I stopped and got my dog." He was not aware that he was under a protective order at that time.

¶34. McCarty admitted that he was sitting in Penny's laundry room when she discovered him on the morning of July 12. McCarty said Penny gave him a "Pop-Tart," and he left to

see if he could get his truck, which had been impounded. McCarty went by a friend's house and then into a nearby church where he "prayed, just wondering what the heck was going on." McCarty claimed that Penny had been stealing pills from her job and had told him, "she'd be damned if she would lose a $116,000 year a job to an alcoholic and a cheater."

¶35. At approximately 6:00 p.m. on July 12, McCarty hitched a ride back to Penny's house because he "had nowhere to go." He testified that Penny already had a black eye when he got there, explaining to him that "her sugar had dropped and she had fell and hit her eye on the coffee table." McCarty said she previously had trouble with her medications. McCarty's version of the incident was that the couple talked for approximately thirty minutes, with him professing his love for her, and then they went to the bedroom and "made love." Afterward, Penny bathed while he sat on the couch, playing with the dog. When Farnham knocked on the door, McCarty walked past him to get the car keys. When he returned, Penny informed him that Farnham was going to contact law enforcement because he knew that there was a restraining order against McCarty, so they left and went to Columbia and stopped at a liquor store. Then, the couple went to Hattiesburg where he stopped and got her water. McCarty claimed that he left the car running both times and that there was no shotgun on the back seat. McCarty noticed Penny's eye was swelling and said she needed to "get something done about [her] eye." He insisted that Penny was never "a hostage" and that she could have alerted anyone at the gas station had she wanted to do so.

¶36. McCarty drove back to Monticello to Jason's house to see about his truck. He said Penny left by herself and went home, and he was arrested shortly thereafter. During the

15

interview with law enforcement, McCarty claimed that "[t]he Under Sheriff came in and dove and grabbed my head and slung it between the corner of the wall, busted out both sides of the three quarter[-]inch [s]heetrock and told me he would say I was a child molester to get me killed." McCarty told law enforcement that the couple had had consensual sex. In a later interview, McCarty requested that law enforcement review security-camera footage from the convenience stores to show that Penny was merely a passenger, "not a hostage or anything." McCarty testified that one of Penny's injections had caused bruising on her stomach area. He asserted, "I've never hit her a day in my life."

¶37. On cross-examination, McCarty's medical records from the night of the incident were admitted without objection. Regarding the altercation with Rayburn, the records noted no "abrasions," "[l]acerations," or "[r]edness or swelling." McCarty denied that he kept Penny from seeing her daughter. He admitted that he had received a copy of the restraining order on July 7 and that the order prohibited him from contacting Penny or coming within 500 yards of her. Regarding Penny's bruised face, McCarty acknowledged that he never drove her to a hospital, but he claimed it was because Penny "wouldn't go." He also testified that Penny's face would often swell due to "severe edema" and that the scratches were from her dog. McCarty admitted that he was a felon with no objection by defense counsel. However, he contended that he "never knew the guns were in the trunk" of Penny's car.

¶38. McCarty's friend Jason testified that he had known McCarty for approximately twenty-five years. On the night of the incident, Jason said McCarty showed up at his house with Penny. Jason had never met her before. He noted that she had a black eye and that her

16

"demeanor[—]she seemed like she was unhappy for sure." However, Jason testified that Penny "didn't seem to be held captive[.]" Jason knew about the restraining order, but McCarty told Jason that he and Penny had "worked everything out and everything was okay."

¶39. Officer Kyle Smith, a Lawrence County sheriff's deputy, was dispatched to Penny's house in June 2018 in response to a 911 call. He encountered McCarty, who told Officer Smith "that there was supposedly narcotics and stuff in [Penny's] vehicle," but the officer found no "probable cause to go further."

¶40. McCarty's half-sister, Lana Swarts, testified that Penny was "definitely jealous" with regard to McCarty and his female friend Melissa. Swarts noted on cross-examination that Penny had sent her a text, "wanting to know had [McCarty] been mean to me or abusive or something like that. And I told her absolutely not. I've never seen any of that side of [him]."

¶41. The jury convicted McCarty on the counts of aggravated assault (choking), kidnapping, and rape. He was acquitted on Count II (possession of a weapon by a felon). The trial court sentenced McCarty as a violent habitual offender to life imprisonment without eligibility for parole on each count, with the sentences to be served consecutively.

¶42. McCarty filed a motion for judgment notwithstanding the verdict, for judgment of acquittal or, in the alternative, for a new trial, which the trial court denied. McCarty, represented by the Office of Indigent Appeals, argues that he is entitled to a new trial (1) under the doctrine of retroactive misjoinder and (2) due to the admission of improper character evidence. Additionally, McCarty has filed a pro se supplemental brief, challenging the sufficiency and weight of the evidence. He also asserts claims of judicial and

17

prosecutorial misconduct and ineffective assistance of counsel.

## DISCUSSION

### I. Whether McCarty was entitled to a new trial under the doctrine of retroactive misjoinder.

¶43. As discussed, McCarty filed a motion to sever the two counts of possession of a weapon by a felon from the remaining counts. The court granted the motion with regard to Count IV (the Winchester rifle) but denied the motion as to Count III (the Browning shotgun). The jury acquitted McCarty of this Count III (renumbered as Count II) at trial. In his posttrial motion, McCarty argued that the trial court erred in denying his motion to sever the counts in the indictment.

¶44. McCarty now asserts that his status as a felon was only admissible to prove an element of the charge for being a felon in possession of a weapon. Because the trial court refused to sever this count, for which he was later acquitted, McCarty contends that this evidence was prejudicial and that his "credibility was unfairly damaged by the jury's knowledge of his convicted felon status." He further claims that "the doctrine of 'retroactive misjoinder' requires that McCarty be retried on the Counts charging aggravated assault, rape, and kidnapping."

¶45. In *Williams v. State*, 37 So. 3d 717, 720-21 (¶¶7, 9) (Miss. Ct. App. 2010), this Court adopted the doctrine of "retroactive misjoinder," which "occurs when joinder of multiple counts was initially proper but, through later developments such as an appellate court's reversal of less than all convictions, joinder has been rendered improper." We further held in *Williams* that "if the defendant can show that he suffered clear and compelling prejudice

18

as a result of the evidence introduced to support the vacated count, he is entitled to a new trial on the remaining count(s)." *Id*. at 721 (¶9). In determining whether the defendant was prejudiced, we employ a two-factor test: "(1) was evidence admitted at trial on the vacated count that would not have otherwise been admissible on the remaining count and, if so, (2) can the defendant demonstrate clear prejudice as a result of the inadmissible evidence that was presented to the jury." *Id*. at (¶10).

¶46. As the State notes, our Court has since clarified that the doctrine of retroactive misjoinder "applies when the defendant was prejudiced by evidence admissible only on a charge that failed or was invalid *as a matter of law*." *Reynolds v. State*, 227 So. 3d 428, 434 (¶25) (Miss. Ct. App. 2017). "So far as we are aware, no case has held that a defendant was entitled, on the ground of retroactive misjoinder, to a new trial on the counts of conviction simply because the jury found the government's proof on other counts unpersuasive." *Id*. (quoting *United States v. Hamilton*, 334 F.3d 170, 183 (2d Cir. 2003)). More recently, this Court rejected a defendant's claim that his acquittal for possession of a firearm by a felon "entitle[d] him to a new trial on [other] charges" under the doctrine. *Jones v. State*, 316 So. 3d 217, 220 (¶8) (Miss. Ct. App. 2021). We reasoned in *Jones* that "the doctrine of retroactive misjoinder does not apply just because the jury returned a split verdict." *Id*. at 222 (¶19) (citing *Reynolds*, 227 So. 3d at 434 (¶25)). Like the defendant in *Jones*, McCarty "was validly indicted and tried for unlawfully possessing a firearm as a felon," *see id*. at 223 (¶20), and the trial jury returned a split verdict, acquitting McCarty of the possession charge. We find no merit to McCarty's claim that he is entitled to a new trial on the other counts

19

under the doctrine of retroactive misjoinder.[5]

**II.    Whether McCarty was unfairly prejudiced by the admission of certain character evidence.**

¶47.    In granting the State's Rule 404(b) motion, the trial court ruled that "[t]he proof of the prior incidents [on June 13, June 15, and July 7] between the Defendant and the alleged Victim . . . are admissible at trial to prove motive, intent, lack of accident or mistake, and a common scheme of physical violence towards the alleged Victim." *See* MRE 404(b)(2). The court further found the protective order was admissible. The trial court concluded "that the probative value of this evidence is not substantially outweighed by a danger of unfair prejudice." *See* MRE 403.

¶48.    McCarty contends that the admission of this evidence was prejudicial and constituted reversible error. He downplays the prior incidents as "nothing more than [his] pitiful, lame attempts at reconciliation[.]" McCarty acknowledges that the court gave a limiting instruction regarding this evidence, but he contends that the instruction "failed to cure and prevent the prejudice of this irrelevant character evidence against McCarty."

¶49.    "[T]he admissibility of evidence is reviewed under an abuse of discretion standard." *Lomas v. State*, 328 So. 3d 670, 688 (¶49) (Miss. Ct. App. 2021) (citing *Saddler v. State*, 297 So. 3d 234, 241 (¶21) (Miss. 2020)). We agree with the State that "the evidence of the prior incidents was admissible to present a rational and coherent story, to show motive and intent, and to rebut McCarty's defenses." The Mississippi Supreme Court has held, "[W]hen

---

[5] Furthermore, the defense did not object to McCarty's admission to being a felon and withdrew the proposed limiting jury instruction.

dealing with closely related acts, the State 'has a legitimate interest in telling a rational and coherent story of what happened.'" *Newell v. State*, 175 So. 3d 1260, 1276 (¶34) (Miss. 2015) (quoting *Welde v. State*, 3 So. 3d 113, 117 (¶14) (Miss. 2009)); *accord Edwards v. State*, 124 So. 3d 105, 113 (¶35) (Miss. Ct. App. 2013) (noting that "there is a recognized exception when the offense charged and the prior crime or bad act are so interrelated or form part of a series of occurrences"). In this instance, the evidence demonstrated the recent deterioration of the couple's marriage due to McCarty's unstable and controlling behavior and provided context for McCarty's brutal attack of Penny on July 12.

¶50. Mississippi Rule of Evidence 404(b)(2) allows evidence of a defendant's prior bad acts "to be admitted 'for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.'" *Carter v. State*, 288 So. 3d 397, 401 (¶17) (Miss. Ct. App. 2019) (quoting MRE 404(b)(2)). In *Taylor v. State*, 954 So. 2d 944, 948 (¶12) (Miss. 2007), the supreme court found that the trial court had "properly admitted evidence" of "prior domestic violence charges" made by the victim, as the evidence "was not admitted to prove that the defendant acted in conformity with his prior bad acts, but to rebut his allegation that the incident was an accident" and to show motive. We likewise find that the evidence of the prior incidents between Penny and McCarty in the month before the attack was admissible to show McCarty's motive, i.e., his increasing anger and opposition toward Penny's seeking a divorce and obtaining the protective order.

¶51. Finally, the evidence of the prior incidents and protective order was relevant to rebut

21

McCarty's defense theories that the couple had consensual sex and that Penny was not a kidnapping victim, but a willing passenger in the vehicle that evening. The protective order showed that Penny was frightened to be around McCarty due to his increased threatening behavior after she sought the divorce.[6] The evidence also showed that Penny's response to McCarty's hostile behavior in the past had been to placate him—e.g., driving him to get gas for his car, begging him not to douse himself with gasoline, walking him out to his car at her place of employment—thereby demonstrating why she was afraid to run away from him on the evening of July 12. Moreover, the trial court gave limiting jury instructions, cautioning that neither the evidence of the "previous domestic violence misconduct of [McCarty]" nor the protective order should be considered as "proof of guilt of the charges for which [McCarty] is presently on trial."

¶52. Therefore, we find no abuse of discretion in the trial court's ruling that the evidence regarding the prior incidents or the protective order was admissible.

### III. Whether McCarty's sentence should be set aside due to actual innocence.

¶53. In his pro se brief, McCarty argues that trial witnesses' inconsistent testimony regarding the details of attack supports his claim of "actual innocence" and that his sentence should be vacated. McCarty is essentially asserting a sufficiency-of-the-evidence claim,

---

[6] Although McCarty suggests that the evidence of the protective order was "patently unfair" and prejudicial because the jury was not informed that the facts supporting the order had not been adjudicated (as the attack occurred the day before the hearing), nothing precluded the defense from informing the jury of this fact at trial. Furthermore, as discussed, we find this evidence was highly probative as to motive and intent, and the trial court issued a limiting instruction as to this evidence.

which we review de novo. *Jones v. State*, 330 So. 3d 793, 801 (¶22) (Miss. Ct. App. 2021) (citing *Clark v. State*, 315 So. 3d 987, 994 (¶7) (Miss. 2021)). "When determining the sufficiency of the evidence, this Court must ask whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Hearn v. State*, 3 So. 3d 722, 740 (¶54) (Miss. 2008)). Viewing the evidence "in a light that is most favorable to the State, . . . the State is given all favorable inferences that can be reasonably drawn from the evidence that was presented at trial." *Id.* (citing *Henley v. State*, 136 So. 3d 413, 415 (¶8) (Miss. 2014)). "If a reasonable trier of fact could evaluate all the evidence and find the essential elements of the charged crime to be proven beyond a reasonable doubt, the court will uphold the jury's verdict." *Id.* (citing *Ronk v. State*, 172 So. 3d 1112, 1129 (¶3) (Miss. 2015)).

¶54. With regard to the count of aggravated assault, a person commits aggravated domestic violence by choking when he "[s]trangles, or attempts to strangle" a "current or former spouse." Miss. Code Ann. § 97-3-7(4)(a)(iii) (Supp. 2016). A person strangles another when he "restrict[s] the flow of oxygen or blood by intentionally applying pressure on the neck, throat or chest of another person by any means." Miss. Code Ann. § 97-3-7(9). Penny testified that McCarty put his forearm around her neck to choke her, causing her to see spots and go limp. McCarty would then loosen his grip, and she would gasp for air. She said that this happened "over and over." Langston testified that Penny's examination revealed "bruising" and "redness" all around Penny's neck area. Langston said, "That has to be from some – I mean, something had to have gotten a hold of her, you know, whether it was the

23

hand or whatever. But something had to have put pressure there for that redness to have occurred." Viewing the evidence in the light most favorable to the State, we find that a rational trier of fact could have found beyond a reasonable doubt that the defendant was guilty of aggravated domestic violence by choking. *See Kirk v. State*, 160 So. 3d 685, 696 (¶30) (Miss. 2015) (finding victim's testimony that the defendant had choked her and other witnesses' testimony that the victim had "red marks on her neck" was sufficient evidence to support guilty verdict).

¶55. As to the kidnapping, McCarty was charged with "feloniously, willfully, without lawful authority and with or without intent to forcibly seize and confine cause [Penny] to be confined or imprisoned against her will, contrary to and in violation of [Mississippi Code Annotated] [s]ection 97-3-53 [(Rev. 2014)]." Penny testified that McCarty bound her ankles with a cord, forced her into the bedroom, forcibly made her bathe, and tied her hands with "hay string." She also said that he forced her into the vehicle and drove her around against her will. Sheriff Everett testified that Penny related in her statement that McCarty "tied her ankles up." Penny also told Langston that McCarty had "tied her up with electrical cord and string, choked her around her neck, and sat on her back." Although McCarty insisted that Penny could have gotten out of the car and left at any of the various stops they made that night, Penny's daughter Jessica testified that when she saw her mother at the sheriff's office, Penny was "severely beaten," and Jessica had "to help her get out of the car." We find this evidence, viewed in the light most favorable to the State, is sufficient for a reasonable jury to find McCarty guilty of kidnapping.

24

¶56. The State also charged McCarty with "willfully, unlawfully and feloniously have forcible sexual intercourse with [Penny,] a female[,] without her consent." *See* Miss. Code Ann. § 97-3-65(4)(a) (Supp. 2017). Penny testified that McCarty dragged her into the bedroom and "forced [her] to do oral sex on him." Upset with her performance, he then performed oral sex on her, and then "he started having sex and then he finished." Langston testified that Penny had said McCarty "penetrated her with his penis during the assault . . . [and] placed his mouth on her genitals and . . . forced his penis in her mouth." Lastly, Heflin, the forensic biologist, testified that the sperm cells collected from Penny's vaginal swabs matched McCarty's DNA. We find this evidence sufficient to support the jury's verdict on this count.

¶57. McCarty also contends that the verdict is against the overwhelming weight of the evidence. "When reviewing a challenge to the weight of the evidence, 'we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.'" *Baughman v. State*, 294 So. 3d 108, 114 (¶24) (Miss. Ct. App. 2020) (quoting *Lloyd v. State*, 228 So. 3d 953, 956 (¶9) (Miss. Ct. App. 2017)). McCarty's argument on this issue is only that the physical evidence admitted at trial—specifically the knife, flashlight, and shotgun—were not sent to the crime lab for fingerprint testing.

¶58. After reviewing the record, we find no merit to McCarty's assertions. As the State notes, "McCarty's arguments in support of his innocence invite the Court to resolve conflicting evidence, re[-]weigh evidence, and determine witness credibility"—all of which

25

are the province of the jury as fact-finders. "Jurors are permitted to and have a duty to resolve conflicts in testimony they hear." *Madere v. State*, 794 So. 2d 200, 216 (¶59) (Miss. 2001). "As an appellate court, we do not second-guess such determinations." *Morris v. State*, 303 So. 3d 9, 18 (¶25) (Miss. Ct. App. 2020). Thus, "[t]o demonstrate actual innocence, [a defendant] must [show] that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him" of the crime charged. *Trotter v. State*, 907 So. 2d 397, 401 (¶12) (Miss. Ct. App. 2005) (internal quotation marks omitted) (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)). We find McCarty has failed to do so, and his claims regarding the sufficiency and weight of the evidence are without merit.

## IV. Whether judicial misconduct occurred.

¶59. McCarty claims that his convictions and sentences "derived from judicial misconduct" and that the trial court "displayed impermissible bias toward the defense." With regard to McCarty's complaints regarding evidentiary rulings where defense counsel either failed to object or did not object on the grounds asserted in McCarty's pro se brief, these arguments are procedurally barred.[7] *See Boggan v. State*, 894 So. 2d 581, 585-86 (¶¶17-18) (Miss. Ct. App. 2004) (holding that claims are procedurally barred where the defense failed to make a contemporaneous objection at trial or objected on different grounds than ones raised on

---

[7] McCarty asserts that Sheriff Everett should not have been allowed to explain what happens during a sexual-assault examination, but defense counsel did not object to this testimony. Further, when Sheriff Everett testified that Penny's written statement coincided with her oral statement, defense counsel objected but stated no basis for the objection, so the judge treated it as a hearsay objection.

appeal).

¶60. McCarty also notes that the trial court allowed certain hearsay testimony. He summarily mentions Dr. Montalvo's testimony regarding Penny's medical records and treatment. However, the trial court properly ruled that this testimony was admissible as a business-record hearsay exception. *See* MRE 803(6)(B). Another alleged instance of judicial misconduct cited by McCarty is the trial court's allowing Sheriff Everett to testify regarding evidence (e.g., nail scrub brush) collected by another officer who was deceased at the time of the trial. The court allowed the testimony because it was offered to show why law enforcement collected that evidence. "Statements do not constitute hearsay when admitted to explain an officer's course of investigation or motivation for the next investigatory step by that officer." *Fullilove v. State*, 101 So. 3d 669, 675 (¶20) (Miss. Ct. App. 2012). We find no error in the trial court's rulings.

¶61. McCarty also contends that the trial judge improperly "admonish[ed]" defense counsel during his questioning of Sheriff Everett. We find the trial judge's comments did not amount to judicial misconduct. After defense counsel made a statement regarding the forensic laboratory's testing capabilities, the trial judge appropriately instructed counsel to refrain from testifying.

¶62. "[A] trial judge is presumed to be qualified and unbiased[,] and this presumption may only be overcome by evidence which produces a reasonable doubt about the validity of the presumption." *Jones v. State*, 841 So. 2d 115, 135 (¶60) (Miss. 2003). We find no reversible error, as McCarty has failed to support his claims of judicial misconduct.

## V. Whether prosecutorial misconduct occurred.

¶63. McCarty also asserts claims of prosecutorial misconduct. He argues that the prosecutor made prejudicial remarks during the trial and improperly elicited expert testimony from lay witnesses. He further contends that the prosecutor "use[d] improper methods to inflame the jury against [McCarty]." "Questions of prosecutorial misconduct will not be addressed where the defendant did not raise the question at trial." *Jackson v. State*, 832 So. 2d 579, 581 (¶3) (Miss. Ct. App. 2002) (citing *Dufour v. State*, 483 So. 2d 307, 311 (Miss. 1985)). Because the defense did not object to any of the cited instances of prosecutorial misconduct, we find this issue is procedurally barred.

¶64. Procedural bar notwithstanding, McCarty fails to demonstrate that a reversible error occurred due to any prosecutorial misconduct. McCarty takes issue with the prosecutor's comment during opening arguments that Penny "was raped and threatened and *then taken and throwed away against her will*." (Emphasis added). He claims that this statement "could only serve to inflame the jury against [McCarty.]" Our standard of review of "allegations of prosecutorial misconduct during opening statements or closing arguments is 'whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created.'" *Fortenberry v. State*, 191 So. 3d 1245, 1251 (¶18) (Miss. Ct. App. 2015) (quoting *Slaughter v. State*, 815 So. 2d 1122, 1130 (¶45) (Miss. 2002)). "Attorneys generally are afforded wide latitude in arguing their cases to the jury." *Ambrose v. State*, 254 So. 3d 77, 130 (¶167) (Miss. 2018) (quoting *Ronk v. State*, 172 So. 3d 1112, 1137 (¶60) (Miss. 2015)). "Even when a prosecutor

has made an impermissible comment," a showing of prejudice is required "to warrant reversal." *Id.* at 129 (¶162) (quoting *Outerbridge v. State*, 947 So. 2d 279, 286 (¶23) (Miss. 2006)). Here, we find McCarty has not shown any prejudice resulting from the prosecutor's comment. Furthermore, the trial court instructed the jury that "[r]emarks of counsel . . . are not evidence" and that "[i]f any remark of counsel has no basis in evidence," the jury "must disregard it."

¶65. McCarty also complains that the prosecution elicited "expert" testimony from lay witnesses about Penny's appearance and demeanor. However, McCarty provides no authority to support a finding that these witnesses needed specialized knowledge to testify that Penny appeared scared and upset. We further find no merit to McCarty's contention that the State's questioning of Langston regarding medical tests she had not performed was prosecutorial misconduct. The defense did not object to this line of questioning; in fact, defense counsel also extensively questioned Langston about Penny's CT scan results.

¶66. In reviewing "a claim of prosecutorial misconduct, we must consider reversal if the 'prosecutorial misconduct endangers the fairness of a trial and the impartial administration of justice.'" *Johnson v. State*, 311 So. 3d 1161, 1173 (¶24) (Miss. Ct. App. 2020) (quoting *Catchings v. State*, 39 So. 3d 943, 947 (¶10) (Miss. Ct. App. 2009)). Because McCarty has failed to demonstrate how the alleged prosecutorial misconduct prejudiced the proceedings, we find this issue is without merit.

## VI. Whether defense counsel rendered ineffective assistance.

¶67. McCarty argues that his defense counsel rendered ineffective assistance, citing his

attorney's failure "to conduct any type of pre-trial investigation," to interview or subpoena defense witnesses, and to object to certain prejudicial testimony during trial. "[G]enerally, ineffective-assistance-of-counsel claims are more appropriately brought during post-conviction proceedings . . . because 'an appellate court is limited to the trial-court record in its review of the claim(s), and there may be instances in which insufficient evidence and/or information exists within the record to address the claim adequately.'" *Osbourne v. State*, 275 So. 3d 1072, 1076 (¶24) (Miss. 2019) (quoting *Dartez v. State*, 177 So. 3d 420, 422-23 (¶18) (Miss. 2015)). Therefore, claims of ineffective assistance usually will only be addressed on direct appeal "when 'the record affirmatively shows ineffectiveness of constitutional dimensions, or the parties stipulate that the record is adequate[,] and the [appellate c]ourt determines that findings of fact by a trial judge able to consider the demeanor of witnesses, etc., are not needed.'" *Id*. at (¶25) (quoting *Robinson v. State*, 247 So. 3d 1212, 1228 (¶35) (Miss. 2018)). The State does not explicitly stipulate that the record is adequate, but it does argue that the record does not affirmatively show counsel's performance was deficient and that McCarty has failed to demonstrate any prejudice as a result of counsel's alleged errors.

¶68. The deficiencies alleged by McCarty all involve the consideration of defense counsel's trial strategy, which this Court generally has determined to be "beyond the contents and face of the record." *Brown v. State*, 282 So. 3d 1192, 1200 (¶30) (Miss. Ct. App. 2019). Therefore, finding the trial record in this case reflects no affirmative showing of ineffective assistance of counsel on its face, we deny relief without prejudice to McCarty's right to seek

the supreme court's permission to pursue the claim in postconviction proceedings. *See*

*Harris v. State*, 311 So. 3d 638, 667 (¶87) (Miss. Ct. App. 2020).

¶69.    **AFFIRMED.**

    **CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**