# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-01421-COA

**MICHAEL JORDAN A/K/A MICHAEL S.**                 **APPELLANT**
**JORDAN A/K/A MICHAEL SHAWN JORDAN**

**v.**

**STATE OF MISSISSIPPI**                                 **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 02/28/2018 |
| TRIAL JUDGE: | HON. LAWRENCE PAUL BOURGEOIS JR. |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: JUSTIN TAYLOR COOK |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: BARBARA WAKELAND BYRD |
| DISTRICT ATTORNEY: | WILLIAM CROSBY PARKER |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 02/14/2023 |
| MOTION FOR REHEARING FILED: | |

### BEFORE BARNES, C.J., GREENLEE AND WESTBROOKS, JJ.

### GREENLEE, J., FOR THE COURT:

¶1. Michael Jordan was convicted by a Harrison County Circuit Court jury of four counts of sexual battery against his fifteen-year-old stepdaughter, Jane.[1] The circuit court sentenced Jordan to thirty years on each count to be served concurrently in the Mississippi Department of Corrections without eligibility for parole. After the denial of Jordan's motion for judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial, the circuit

---

[1] The name of the victim, as well as the name of her family members, have been changed to protect her identity.

court granted his motion to file an out-of-time appeal.

¶2. On appeal, Jordan claims (1) the circuit court erred by admitting into evidence the sexual assault nurse examiner's testimony that Jane's physical examination was not abnormal, (2) the circuit court erred by admitting into evidence a video recording of him and Jane, (3) his counsel was ineffective for failing to object on the basis of hearsay to the admissibility of Jane's letter to her mother, and (4) the State did not present sufficient evidence to convict him of sexual battery in Count IV of the indictment. Finding no reversible error, we affirm Jordan's convictions and sentence.

## FACTS AND PROCEDURAL HISTORY

¶3. Jane's mother Joan began dating Jordan when Jane was in elementary school. Joan and Jordan eventually married, and the family moved to North Carolina when Jane was in middle school. When Jordan first moved in, Jane and her siblings got in trouble a lot because Jordan felt they were being disrespectful toward him. When Jane was in approximately the ninth grade, her relationship with Jordan seemingly improved as he drove her home from school and extracurricular activities. Around that time, Jane started feeling more comfortable around Jordan, he started giving her "lessons" on how to talk to and interact with boys. When they were in the car together, Jordan would touch Jane's thigh or grab her like he was going to kiss her while they acted out dates. He would tell her, "These are the kind of things you have to be prepared for that a guy might do." Eventually, Jordan told Jane that he liked her and asked her if she was ready to take their relationship to the next level. But later he told her, "It was a joke. It was a test." Unsurprisingly, Jane was confused.

2

¶4.     In 2014, when Jane was in the tenth grade, she and her family moved to Mississippi. Later that year—from November 30, 2014, to December 12, 2014—Joan traveled to Missouri for work. While Joan was out of town, Jordan told Jane that her mother wanted him to teach her about boys, and he started giving Jane more "lessons" at night. Jordan told Jane how boys liked to be touched and kissed, and then he would demonstrate on her or ask her to demonstrate on him. Eventually, Jordan performed oral sex on Jane. They continued to have sex—vaginal, oral, and anal—almost every night while Joan was out of town. Jane was fifteen years old.

¶5.     Jordan's sexual abuse of Jane continued after Joan returned from Missouri. At some point, Jane tried to convince Jordan to stop. But Jordan kept making advances toward Jane, and she felt obligated to continue having sex with him. On April 10, 2015, Joan came home early while Jordan was performing oral sex on Jane in the laundry room. According to Joan, Jane looked startled when she encountered her in the TV room. Then Joan saw a light on in the laundry room. When she went to the door, she noticed that Jordan had an erection through his boxers. Jordan immediately asked Joan why she did not call him before coming home, which was confusing to Joan because she had never done that before. Joan became suspicious and decided to purchase a "nanny cam" to place in the house.

¶6.     The nanny cam arrived several days later on April 15, 2015. Joan thought Jordan would notice the camera in the laundry room, so she placed it in the garage where Jordan spent a lot of time. Later, she moved the camera and placed it between the kitchen and the TV room. Joan watched and deleted the recordings daily because she did not know how

3

much recording space was on the camera. On April 28, 2015, at 9:49 p.m., the camera recorded Jordan and Jane sitting on the couch having a conversation. Then Jordan put his foot on Jane's leg, and she began sucking his toes.[2] The video recording was published to the jury at trial.

¶7. After watching the video, Joan filed a report with the Gulfport Police Department. Then Joan took Jane to the Department of Human Services (DHS) where Jane was questioned about her relationship with Jordan. Initially, Jane did not disclose the sexual abuse, but eventually she disclosed what Jordan had done to her. At some point later, Jane wrote a letter to her mother about what happened. The letter was published to the jury at trial.[3]

¶8. Cassie Harrell, a registered nurse and SANE nurse (sexual assault nurse examiner) with Gulfport Memorial Hospital, testified that Jane came to the emergency room with her mother on May 1, 2015, after being referred by DHS. Jane reported that she had been sexually assaulted by her stepfather, Jordan, from December 2014 to April 2015. Jane disclosed oral, rectal, and vaginal penetration with his penis and finger, and she said that Jordan had choked her as well. Harrell then performed a sexual assault kit on Jane but did not find anything of evidentiary note during the examination. Over numerous objections from defense counsel, Harrell testified that she did not find anything "abnormal," which was not surprising considering approximately three weeks had passed since Jane's last sexual

---

[2] According to Jane, Jordan would suggest that he wanted this by putting his foot up.

[3] The contents of the letter will be discussed in more detail in the Discussion section.

encounter with Jordan. Similarly, Jane testified, "I didn't think [the nurse] would [be] finding anything because we hadn't had sexual relations very recently."[4]

¶9. Amy Winters, an expert in forensic serology, tested the swabs taken from Jane's mouth, vagina, and rectum for the presence of seminal fluid. According to Winters, all the swabs tested negative for seminal fluid. Winters explained that seminal fluid may not have been detected for the following reasons: ejaculation may not have occurred, ejaculation may have occurred on a surface other than Jane's body, a condom may have been used, any semen sample may have broken down or expelled from Jane's body over time, or the incident did not occur. Additionally, she explained that seminal fluid most likely would not be detected in the vagina more than three days after intercourse, in the rectum after one day, or in the mouth after several hours. Finally, Winters indicated that if the last times Jane had vaginal sex and oral sex were April 10, 2015, and April 26, 2015, respectively, she would not expect to find seminal fluid on swabs that were obtained on May 1, 2015.

¶10. Ultimately, the jury convicted Jordan of all four counts of sexual battery. Subsequently, Jordan filed a motion for JNOV or, in the alternative, a new trial. After a hearing, the court denied the motion. Later, the circuit court granted Jordan's motion to file an out-of-time appeal.

**DISCUSSION**

I. **Whether the circuit court erred by allowing the SANE nurse to testify that the results of Jane's sexual assault kit were not abnormal.**

---

[4] Jane could not remember if she assumed the nurse would not be able to find anything or if someone told her.

5

¶11.    Jordan seemingly claims that the circuit court erred by allowing Harrell (the SANE nurse) to offer expert opinion testimony regarding her physical examination of Jane. "The admission of evidence is reviewed under the abuse-of-discretion standard." *Smith v. State*, 326 So. 3d 510, 517 (¶17) (Miss. Ct. App. 2021) (citing *Boggs v. State*, 188 So. 3d 515, 519 (¶9) (Miss. 2016)).

¶12.    At trial, Harrell indicated that she did not find anything of evidentiary note while examining Jane. When the prosecutor asked her if that was normal or abnormal given the circumstances, defense counsel objected based on lack of a proper foundation. After the circuit court instructed the State to lay a proper foundation, Harrell testified that she had been a SANE nurse for four and one-half years and that she had applied twelve to fifteen sexual assault kits. Then Harrell testified that she did not find anything "abnormal" during Jane's examination. Defense counsel objected again, and the circuit court instructed Harrell to define "abnormal." Harrell explained that "abnormal" would include the presence of cuts, growths, bruising, discoloration, or bleeding. Harrell testified that she did not find anything abnormal in this case, which did not surprise her. Defense counsel objected again and argued that the question—whether the lack of any abnormal findings was surprising—required Harrell to reach an opinion or conclusion. Then the following colloquy occurred:

> COURT:    That's what she [was] called for. It's overruled. She can answer it.
>
> COUNSEL:  Your Honor, I don't think she's qualified to - -
>
> COURT:    I've ruled.
>
> COUNSEL:  I'm just - -

6

COURT: You got your objection.

COUNSEL: With all due respect to the [c]ourt, Your Honor, I have to articulate my reasons why.

COURT: I'm going to give you an opportunity, but not in front of the jury.

COUNSEL: Yes, sir. We can do that later. We appreciate it.

When Harrell repeated that she was not surprised by the lack of findings and asked why she was not surprised, defense counsel renewed the previous objection, and it was overruled again. Harrell testified that she was not surprised by the lack of findings because approximately three weeks had passed between Jane's last sexual encounter and her examination. When the prosecutor asked why there would be nothing abnormal after three weeks, defense counsel objected and argued that Harrell had not been qualified to give a medical opinion. The circuit court overruled the objection and seemingly granted the defense a continuing objection. Outside the presence of the jury, defense counsel reiterated that his objection was that Harrell was "not qualified to give [the] opinion that you're going to allow her to give . . . . She has to have some factual technical, scientific basis in her training, her knowledge, her experience. She has to be qualified to give that opinion." Then defense counsel clarified, "I mean, she may be qualified to do it, but she hasn't been qualified correctly to do so." The circuit court noted that Harrell had not been tendered as an expert, and the State seemingly agreed to move on.

¶13. "There is often a very thin line between fact and opinion testimony." *Chaupette v. State*, 136 So. 3d 1041, 1045 (¶8) (Miss. 2014) (internal quotation marks omitted) (quoting *Sample v. State*, 643 So. 2d 524, 530 (Miss. 1994)). "Before providing expert opinion

7

testimony, a witness must be qualified, tendered, and accepted as an expert under Rule 702 of the Mississippi Rules of Evidence." *Id*. (citing *Cotton v. State*, 675 So. 2d 308, 312 (Miss. 1996)). "In contrast, lay witnesses can provide opinion testimony only if it is 'rationally based on their perception and helpful to the clear understanding of the testimony or the determination of a fact in issue.'" *Id*. (quoting MRE 701). "But if an opinion is based on scientific, technical, or other specialized knowledge, it can be admitted only under the guidance of Rule 702 and an expert opinion." *Id*. "An opinion is based on scientific, technical, or other specialized knowledge if the witness must possess some experience or expertise beyond that of the average randomly selected adult to express the opinion." *Id*. (internal quotation marks omitted) (quoting *Langston v. Kidder*, 670 So. 2d 1, 3-4 (Miss. 1995)).

¶14.    At trial, Jordan essentially took issue with the fact that Harrell was not *tendered* as an expert witness. In *McBeath v. State*, 739 So. 2d 451 (Miss. Ct. App. 1999), this Court noted that "the proper procedure . . . when an expert witness is offered is for the court to permit qualification by the party offering the expert witness, and then to permit voir dire by the opposite party before ruling on the competency of the witness." *Id*. at 453 (¶8). "The failure to follow this procedure[, however,] does not per se constitute reversible error." *Id*. In *McBeath*, the prosecution failed to tender a treating physician as an expert witness. *Id*. Although McBeath challenged the expert testimony on appeal, the record showed that "the defense failed to object to [the witness's] qualifications." *Id*. at 454 (¶10). This Court noted that "[t]he supreme court has refused to hold that an expert was not properly qualified when

8

the opposing party did not object to the witness's credentials but only to the testimony." *Id*. at 454 (¶10) (citing *Baine v. State*, 604 So. 2d 249, 255 (Miss. 1992)). "In other words, objections to testimony do not constitute an objection to qualifications." *Id*. Because Jordan did not object to Harrell's credentials or qualifications, the issue of her qualification as an expert witness was waived. *See id*.

¶15. Notwithstanding the waiver, we note that Jordan elicited the same testimony from Harrell during cross-examination. On cross-examination, Harrell testified that Jane's physical examination did not reveal any abnormalities. She further testified that the last times that Jane had vaginal sex and oral sex were on April 10, 2015, and April 26, 2015, respectively. A jury could reasonably infer, given the amount of time that had elapsed, that nothing of evidentiary value would be present at the time of the sexual assault kit on May 1, 2015—approximately three weeks later. Additionally, Jordan made no objection to, and effectively permitted, two other witnesses to testify in the same manner. Winters—the forensic biologist who tested the swabs from the sexual assault kit—indicated that she would not expect to find the presence of seminal fluid on the swabs given the amount of time that had elapsed before the swabs were obtained. Finally, Jane testified, "I didn't think [the nurse] would [be] finding anything because we hadn't had sexual relations very recently." For these reasons, we find that the admission of Harrell's testimony does not constitute reversible error.

## II. Whether the circuit court erred by admitting into evidence the "nanny cam" video.

¶16. Jordan claims the circuit court erred by admitting into evidence the "nanny cam" video

that showed Jane sucking his toes. As stated, "[t]he admission of evidence is reviewed under the abuse-of-discretion standard." *Smith*, 326 So. 3d at 517 (¶17) (citing *Boggs*, 188 So. 3d at 519 (¶9)).

¶17. Before trial, defense counsel made an ore tenus motion to exclude the video. The prosecutor argued that the video was admissible because it corroborated Jane's testimony that a relationship existed between Jordan and Jane, and it was admissible to explain what led Jane's mother to the police. Defense counsel acknowledged that he could use the video to show that the camera was recording for two weeks, yet there was no video footage of Jordan and Jane having sex. Defense counsel also seemingly acknowledged that the video was not very prejudicial to Jordan for this reason. Defense counsel suggested that the circuit court provide a limiting instruction to the jury about "assessing weight and credibility." The State agreed that it would supply a limiting instruction if needed. Ultimately, the circuit court found that the video was more probative than prejudicial, and the video was admitted into evidence and played for the jury at trial.

¶18. Although Jordan cites Mississippi Rules of Evidence 401, 402, 403, and 404(b) as well as caselaw pertaining to the admissibility of prior bad acts, he does not explain how the circuit court allegedly erred by admitting the video into evidence. Our rules of appellate procedure require that the appellate brief "contain the contentions of appellant with respect to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record relied on." M.R.A.P. 28(a)(7). "Rule 28(a) 'does not simply require a party to mention authority; the authority must be used to develop the argument in

10

a meaningful way.'" *Lewis v. State*, 295 So. 3d 521, 538 (¶55) (Miss. Ct. App. 2019) (quoting *Walker v. State*, 197 So. 3d 914, 919 (¶25) (Miss. Ct. App. 2016)). Because Jordan's argument regarding the admission of the video does not comply with Rule 28(a)(7), it is procedurally barred.

> ### III. Whether Jordan was denied effective assistance of counsel when trial counsel did not object on the basis of hearsay to the admission of Jane's letter.

¶19. Jordan claims he was denied effective assistance of counsel when the State sought to admit a letter that Jane had written to her mother, and trial counsel did not object on the basis of hearsay.

¶20. In the letter, Jane explained to her mother that Jordan had initially given her "lessons" about boys. Then Jordan began saying "weird things" like asking her if she was ready to take their relationship to the next level, but he would quickly tell her that he was joking or testing her. He also taught her "how to hold and make a man feel good." Jane explained in the letter that she was confused by Jordan's words and actions, but she explained that she did not know how she was supposed to learn about boys otherwise. Although Jane did not go into detail about their sexual encounters, she did state that Jordan "tr[ied] to get way too sexual." Afterward, he told her that he "messed up," that he was going to Georgia for a while, and that he would avoid her in the house when he returned. However, the "lessons" resumed, and things "got more sexual." Jane stated that she tried to end the relationship, but Jordan continued making advances toward her.

¶21. "A claim of ineffective assistance of counsel may be asserted on direct appeal if the

11

defendant is represented by appellate counsel who did not represent him at trial." *Stevens v. State*, 312 So. 3d 1205, 1210 (¶13) (Miss. Ct. App. 2021) (citing *Ellis v. State*, 281 So. 3d 1092, 1099 (¶20) (Miss. Ct. App. 2019)). "Generally, however, such claims are more appropriately brought during post-conviction proceedings." *Id*. at 1210-11 (¶13) (internal quotation marks omitted) (quoting *Ross v. State*, 288 So. 3d 317, 324 (¶29) (Miss. 2020)). "This Court will address such claims on direct appeal when [1] the record affirmatively shows ineffectiveness of constitutional dimensions, or [2] the parties stipulate that the record is adequate and the Court determines that the findings of fact by a trial judge able to consider the demeanor of witnesses, etc., are not needed." *Id*. at 1211 (¶13). Additionally, "we may address such 'claims on direct appeal when the record affirmatively shows that the claims are without merit.'" *Id*.

¶22.    "To prevail on a claim of ineffective assistance, the defendant must show *both* (1) 'that counsel's performance was deficient' . . . and (2) that he was prejudiced as a result . . . ." *Id*. at (¶14) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Sandlin v. State*, 312 So. 3d 1191, 1197 (¶14) (Miss. Ct. App. 2020) (quoting *Wilcher v. State*, 863 So. 2d 776, 796 (¶30) (Miss. 2003)). "In determining what falls into the category of trial strategy, this Court has held that 'Counsel's choice of whether or not to file certain motions,

12

call certain witnesses, ask certain questions, or make certain objections falls within the ambit of trial strategy.'" *Id*. (quoting *Hill v. State*, 850 So. 2d 223, 226 (¶14) (Miss. 2003)).

¶23. At trial, defense counsel objected to the letter as cumulative. Defense counsel then stated, "She hasn't demonstrated any ability to recall these events. I'm not certain for what purpose it is being offered and why." The circuit court overruled the objection.[5]

¶24. Even if trial counsel's decision not to object to the letter on the basis of hearsay was not a strategic choice, Jordan "fails to establish prejudice, i.e., he fails to show that there is a reasonable probability that the verdict would have been different had the hearsay been objected to and excluded." *Shinn v. State*, 174 So. 3d 961, 967 (¶17) (Miss. Ct. App. 2015) (internal quotation marks omitted); *see also Webb v. State*, 113 So. 3d 592, 602 (¶37) (Miss. Ct. App. 2012) ("Where corroborative evidence exists and the hearsay evidence is merely cumulative, the admission may be held to be harmless."). Due to the overwhelming evidence of Jordan's guilt and the cumulative nature of the letter, we find that any errors resulting from the admission of the letter were harmless.

### IV. Whether the State presented sufficient evidence to convict Jordan of sexual battery under Count IV of the indictment.

¶25. Finally, Jordan claims the State did not present sufficient evidence to convict him of sexual battery under Count IV of the indictment in violation of Mississippi Code Annotated section 97-3-95 (Rev. 2014). Specifically, Jordan argues that no evidence was presented to show that he committed sexual battery "by engaging in the act of sexual penetration, to-wit:

_____

[5] Later, defense counsel seemingly objected to the letter being explained to the jury, but the circuit court overruled the objection.

13

by inserting his penis into the mouth of [Jane]."

¶26.     "When reviewing a challenge to the sufficiency of the evidence, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Russell v. State*, 296 So. 3d 217, 223 (¶17) (Miss. Ct. App. 2020) (quoting *Reynolds v. State*, 227 So. 3d 428, 436 (¶32) (Miss. Ct. App. 2017)).   "The issue on appeal is not whether the reviewing court would have found the defendant guilty; rather, the conviction must be affirmed if there was sufficient evidence for 'any rational trier of fact' to have rendered a guilty verdict." *Id*.

¶27.     Despite Jordan's claim to the contrary, Jane testified at trial that she and Jordan engaged in oral sex "when he put his mouth on my vagina or vice versa.  I put my mouth on his penis."   We find that after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

¶28.     **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND EMFINGER, JJ., CONCUR.  WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.  SMITH, J., NOT PARTICIPATING.**