# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-KA-00846-COA

JACOB REYNOLDS A/K/A JACOB LEE
REYNOLDS

APPELLANT

v.

STATE OF MISSISSIPPI

APPELLEE

DATE OF JUDGMENT:                05/05/2016
TRIAL JUDGE:                     HON. JUSTIN MILLER COBB
COURT FROM WHICH APPEALED:       LAUDERDALE COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:          OFFICE OF STATE PUBLIC DEFENDER
                                 BY: HUNTER NOLAN AIKENS
ATTORNEY FOR APPELLEE:           OFFICE OF THE ATTORNEY GENERAL
                                 BY: LAURA HOGAN TEDDER
DISTRICT ATTORNEY:               BILBO MITCHELL
NATURE OF THE CASE:              CRIMINAL - FELONY
DISPOSITION:                     AFFIRMED - 09/19/2017
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE GRIFFIS, P.J., CARLTON, WILSON AND GREENLEE, JJ.**

**WILSON, J., FOR THE COURT:**

¶1.     Armed with a gun and a baseball bat, Jacob Reynolds and an accomplice robbed the

Dollar General on Highway 45 in the unincorporated community of Lauderdale.  Jacob was

indicted on two counts of armed robbery—one count for each of the two employees present

in the store during the robbery—and for possession of a weapon by a convicted felon.  A

Lauderdale County jury found Jacob guilty of both counts of armed robbery but not guilty

of the felon-in-possession charge.  The circuit court sentenced Jacob to two concurrent terms

of thirty-one years in the custody of the Mississippi Department of Corrections.

¶2.    On appeal, Jacob argues that (1) he is entitled to a new trial under the doctrine of "retroactive misjoinder" because he was unfairly prejudiced by evidence introduced on the felon-in-possession charge; (2) there was insufficient evidence to support his conviction on the second count of armed robbery because he did not take any property from the "person or presence" of the victim, an employee who fled to a stockroom at the outset of the robbery; and (3) his conviction on two counts of armed robbery for taking the same money violates the state and federal constitutional protections against double jeopardy.  We conclude that these arguments are without merit and therefore affirm.

### FACTS AND PROCEDURAL HISTORY

¶3.    Jacob lived with his younger brother, Jason Reynolds, in an RV at a trailer park in Lauderdale County.  On September 11, 2014, Jacob, Jason, and their friend Jarred Baysinger were at the RV trying to come up with a way to get money fast.  Jarred's girlfriend, Claire Parker, was "begging" Jarred and Jacob to go to Disney World the next day with her family.  But Jarred and Jacob did not have enough money for the trip.

¶4.    Jason testified that they eventually decided to rob the Dollar General on Highway 45 in Lauderdale.  Jason previously worked at the store. According to Jason, his role was to enter the store, see how many people were there, and then tell Jacob and Jarred whether to go ahead with the robbery.  They planned to rob the store shortly before it closed at 10 p.m.

¶5.    Jason entered the Dollar General around 9:30 p.m. and bought a Black & Mild cigar. He used a lot of pennies to pay for the cigar, and the cashier, Audria Brown, thought that he

2

seemed to be "stalling." Audria recognized Jason as having worked at the store, although they never worked there at the same time. After Jason made his purchase and left, Audria noticed that a group of five to ten young men were milling around outside of the store.

¶6. Jason testified that after he left the store he called Jacob or Jarred to let them know how many people were inside. Audria testified that about twenty-five to thirty minutes after Jason left, while she was preparing for a sale the next day, she looked up and noticed that a man was waiting at her register. Audria was about to return to her register when she saw that the man was "ducking like he was scared." When she turned around, she saw two men coming in the front door and "rushing" toward the store's office. The first man was wearing a mask and carrying "something black." Audria thought that the black object was a shotgun because of how the man was holding it and because she thought that she heard something "click." Audria did not see or recall much about the second man. She was worried because she knew that the other employee in the store, Lakisha Matthews, was in the office counting down her register. Audria immediately ran to a stockroom in the back of the store. She hid there until Lakisha came and found her after the robbery was over.

¶7. Marcus Moore was shopping at the Dollar General when the robbers entered. Marcus testified that both men were wearing masks, that one man was carrying a handgun, and that the second man was carrying what appeared to be a shotgun. Marcus later learned that the second man was actually carrying a baseball bat, but he thought that it was a shotgun because of the way the man was holding it up, almost at shoulder level. Marcus "hesitated for a

3

minute" and then "ran out of the store." The man with the baseball bat chased after him but then returned to the store.

¶8. Alisha Harris and her daughter Niah were also in the Dollar General at the time of the robbery. Both heard a man say "give me the money," and Niah saw a man in a mask. They then hid in the stockroom with Audria until the robbery was over.

¶9. Lakisha was counting the money from her register when the two men "rushed" into the office. One of the men put a gun to her head and ordered her to give him the money that she was counting, which she did. The man then told her "to go to the safe and get the money out of the safe." The safe was at the front of the store near the cash registers. Lakisha went to the safe, which was unlocked, and gave the man the money that was inside of it.

¶10. Lakisha explained that cash drops from each register were made to the safe throughout the day and at the end of the day just before closing. Lakisha testified that the safe took about ten minutes to open, so employees sometimes left the safe cracked open while counting down their registers at closing time.

¶11. After the men left, Lakisha found Audria and the Harrises in the stockroom. Lakisha testified that approximately $150 was stolen from her register. On the night of the robbery, she provided law enforcement with an estimate of how much had been stolen from the safe, but at trial she could not recall what she told them.

¶12. Jason testified that he returned to the RV after he left the Dollar General. About thirty minutes or an hour later, Jacob, Jarred, and Claire all arrived in Claire's car. Jason denied

4

that anyone ever discussed the robbery. He also denied that he ever saw Jacob with a large amount of cash. However, Jason admitted that nobody had any money beforehand, but after Jacob and Jarred returned to the RV, they suddenly had enough money to spend the night at a hotel and buy crystal meth. They gave Jason $200 or $300 worth of crystal meth.

¶13. The next day, Claire, Jacob, and Jarred all left for Disney World. Jason "wasn't invited and didn't want to go" anyway. Claire testified that Jacob and Jarred paid for gas, most of their own meals, and admission to the parks during their vacation.

¶14. About a month after the armed robbery, Jason was arrested for commercial burglary in Florida and extradited back to Mississippi. Once he returned to Mississippi, Jason was interviewed by Investigator Joe Boswell with the Lauderdale County Sheriff's Department and gave a written statement. Jason testified against his brother as part of a plea agreement. Jason testified that in exchange for his testimony, the charge of armed robbery against him would be dismissed.

¶15. Jason identified his brother in a still photo from surveillance video taken at the Dollar General. The surveillance video from the Dollar General was admitted into evidence at trial. According to Boswell, the video showed Jacob entering the Dollar General at 9:33 p.m., approximately twenty to twenty-five minutes prior to the robbery, without a mask. Boswell believed that one of the robbers who entered the store again twenty to twenty-five minutes later was Jacob because the robber appeared to have on the same pants, shoes, and t-shirt as Jacob, although the t-shirt appeared to be turned inside out during the robbery.

5

¶16.   At trial, Jason testified that "it looked like" his brother in the still photos of the video, but he could not "positively" identify him.  Jason testified that he had been able to identify his brother in the video because of "the way he walks, his swagger."  Boswell testified that he did not recall having shown Jason the video, but Jason could have seen the video on the local news or social media.  Boswell testified that Jason told him that Jacob and Jarred decided to rob the Dollar General because they needed money to go to Disney World and because he (Jason) was familiar with the store's closing procedures.

¶17.   On October 22, 2014, Claire and Jarred were stopped by officers from the sheriff's department while driving in Claire's car.  The officers obtained a search warrant for Claire's car and found a Llama .380 pistol under the driver's seat and drugs.  Boswell believed the Llama was the same gun used in the Dollar General robbery.  Because Claire was high on spice when she was arrested, officers waited until the next day to interview her.  Claire then told the officers what she knew and provided a written statement.  At trial, Claire testified that she never discussed the robbery with either Jacob or Jarred.

¶18.   The sheriff's department obtained a search warrant for Jason's and Jacob's RV. During the search, another resident of the trailer park approached officers and told them that his Llama .380 pistol had been stolen and that he suspected that Jacob had stolen it.

¶19.   Jacob, Jarred, and Jason were all indicted for the armed robbery of the Dollar General. Count I of a subsequent superseding indictment charged Jacob with armed robbery, alleging that he took the property of the Dollar General, consisting of approximately $1,800, "from

6

the person and presence of Lakisha Matthews, an employee of Dollar General, against her will by violence to her person or by putting her in fear of immediate injury to her person by the exhibition of a deadly weapon, to-wit: a handgun and a baseball bat." Count II also charged Jacob with armed robbery. Count II was identical to Count I except that it identified Audria Brown as the victim. Count III of the indictment charged Jacob with unlawful possession of a firearm by a convicted felon and specifically identified the firearm as the "Llama Stoeger Arms .380 cal. pistol." During trial, the State moved to amend the references to $1,800 in Counts I and II of the indictment to read $100. The amendment was requested as a result of Lakisha's uncertainty at trial as to how much money was in the store's safe at the time of the robbery. The trial judge granted the State's motion.

¶20. At the close of the evidence, the jury found Jacob guilty of both counts of armed robbery. The jury acquitted him on Count III, possession of a firearm by a convicted felon.[1] The court sentenced Jacob to thirty-one years in the custody of the Department of Corrections on each count, with the sentences to run concurrently.

## DISCUSSION

¶21. On appeal, Jacob raises the three issues noted in paragraph 2, *supra*. We address

---

[1] In closing argument, defense counsel argued that there was "no hard evidence" that the Llama .380 was the same gun that was used during the robbery and that the gun used in the robbery "could have been a toy gun." During deliberations, the jury inquired whether the gun had to be the specific Llama pistol identified in the jury instructions "or just a firearm/handgun." Without objection, the court answered that the jury should refer to the instructions previously given by the court and continue deliberations. At his sentencing hearing, Jacob maintained that the gun used in the robbery "was fake."

those issues in turn below.

## I.     "Retroactive Misjoinder"

¶22.    This Court adopted the doctrine of "retroactive misjoinder" in *Williams v. State*, 37 So. 3d 717, 720-21 (¶9) (Miss. Ct. App. 2010).  Williams was indicted for aggravated assault for stabbing a man with a small pocket knife (Count I) and for being a felon in possession of the knife (Count II).  *Id.* at 719 (¶¶3-4).  At trial, Williams stipulated that he was a prior convicted felon, and he was convicted on both counts.  *Id.* at (¶4).  On appeal, the State "concede[d] that the knife could not be described as a knife prohibited from possession by a felon by section 97-37-5(1),"[2] and this Court agreed with the State's concession; therefore, the Court reversed and rendered Williams's conviction on Count II.  *Id.* at 719-20 (¶5).

¶23.    Williams argued that his conviction on Count I had to be reversed as well because evidence of his prior felony conviction—which was admissible only on Count II—was "improper and prejudicial."  *Id.* at 720 (¶6).  In addressing Williams's argument, this Court "adopt[ed] the doctrine of retroactive misjoinder."  *Id.* at 721 (¶9).  We held that retroactive misjoinder "occurs when a trial or appellate court determines that while joinder of two or more counts against a defendant was initially proper, one or more of those counts should be vacated."  *Id.*  We held that a defendant in such a case is entitled to a new trial on the remaining count(s) if he "can show that he suffered clear and compelling prejudice as a result

---

[2] "The trial judge stated that the knife was 'the smallest pocket knife' he had ever seen."  *Williams*, 37 So. 3d at 720 n.1.

of the evidence introduced to support the vacated count." *Id.*

¶24. Jacob argues that this doctrine applies in the present case because the jury found him not guilty on Count III. However, *Williams* is materially distinguishable because it involved a legally invalid conviction that was vacated because the defendant's possession of the very small pocket knife at issue was perfectly lawful. The issue in this case is different. It is not lawful for a convicted felon to possess a gun, nor was the evidence legally insufficient to convict Jacob of possessing a gun. This is simply a case in which the jury found the defendant not guilty on one count of a multi-count indictment. Specifically, the jury did not find, beyond a reasonable doubt, that Jacob possessed the particular Llama .380 caliber pistol identified in the indictment and jury instructions.

¶25. "[S]o far as we are aware, no case has held that a defendant was entitled, on the ground of retroactive misjoinder, to a new trial on the counts of conviction simply because *the jury* found the government's proof on other counts unpersuasive." *United States v. Hamilton*, 334 F.3d 170, 183 (2d Cir. 2003) (emphasis added). Indeed, the U.S. Court of Appeals for the Seventh Circuit has stated that "[w]hen, as is often the case . . . , the jury acquits a defendant of some counts of a multi-count indictment, the defendant is not entitled to a new trial on the counts of which he was convicted, on the theory that the conviction was tainted by evidence, which the jury heard, relating to the counts on which it acquitted." *United States v. Holzer*, 840 F.2d 1343, 1349 (7th Cir. 1988). The doctrine of retroactive misjoinder applies when the defendant was prejudiced by evidence admissible only on a

9

charge that failed or was invalid *as a matter of law*. In the more typical case of conviction on some counts and acquittal on others, "the time to decide whether it is fair to subject a defendant to a single trial for a variety of crimes . . . is before trial, when the defendant can complain of misjoinder . . . or move for a severance." *Id.*[3]

¶26.    In any event, even if the doctrine of retroactive misjoinder could apply in a case such as this, Jacob is not entitled to relief. A defendant claiming retroactive misjoinder must (1) show that "evidence [was] admitted at trial on the vacated count that would not have otherwise been admissible on the remaining count" and (2) "demonstrate clear prejudice as a result of the inadmissible evidence that was presented to the jury." *Williams*, 37 So. 3d at 721 (¶10). Indeed, this Court has stated that the defendant must "show that he suffered *clear and compelling* prejudice." *Id.* at (¶9) (emphasis added). "The strength of the State's case against the defendant on the remaining count, the specific evidence presented in connection with the vacated count, and other pertinent details of the defendant's case and trial should be analyzed in determining if the defendant was prejudiced." *Id.*

¶27.    In *Williams*, Williams testified and admitted that he stabbed the victim (Walls), and on the aggravated assault charge, "the central issue . . . for the jury was whether Williams acted in necessary self-defense." *Id.* at 722 (¶13). This Court reasoned that because "the

---

[3] In essence, by invoking the retroactive misjoinder doctrine, Jacob is attempting to avoid the general rule that a defendant who fails to file a motion to sever charges prior to trial is procedurally barred from raising the issue on appeal. *See Harris v. State*, 908 So. 2d 868, 875 (¶21) (Miss. Ct. App. 2005).

evidence presented to the jury did not amount to much more than a swearing match between Williams and Walls, the credibility of both individuals was of the utmost importance to Williams's defense." *Id.* at 727 (¶31). We concluded Williams suffered prejudice based on "the repeated mentioning of [his] prior felony conviction by the trial court and the State, the complete lack of any limiting instruction informing the jury that it [should] only consider his prior conviction under Count II, and the lack of an abundance of evidence that Williams did not act in self-defense." *Id.*

¶28. In this case, the jury was informed of Jacob's prior conviction only because he was also on trial for unlawful possession of a firearm as a convicted felon. However, Jacob cannot "show that he suffered clear and compelling prejudice" as a result. *Id.* at 721 (¶9). The jury was informed of the prior conviction by a stipulation that did not disclose the offense, and the State did not unduly emphasize the conviction or introduce any other evidence of it. Moreover, unlike *Williams*, the trial judge instructed the jury that the stipulation was "for the limited and sole purpose of proving the prior felony element of the charge of possession of [a] firearm by a convicted felon." The judge specifically instructed the jury that the prior conviction could "not be considered as evidence that [Jacob] committed" the crime of armed robbery. Also, unlike *Williams*, Jacob did not testify, so his "credibility" was not "of the utmost importance to [his] defense." *Id.* at 727 (¶31). The issue for the jury in this case was simply whether the State had proven that Jacob was one of the two masked robbers of the Dollar General. The State presented ample evidence to support

11

the jury's verdict, and Jacob cannot show that the stipulation caused him any "clear and compelling prejudice."

¶29.    In addition, we note that Jacob's trial counsel made a strategic decision to cross-examine Investigator Boswell about Jacob's admission that he had robbed "the Dixie Oil," a gas station.  Counsel brought out that although Jacob had admitted to robbing the Dixie Oil, he also told Boswell: "I may have been at the Dollar General, but I wasn't the one who robbed it."  This information was first elicited by Jacob, not the State.  Counsel's point was to suggest that if Jacob was truthful when he admitted robbing the Dixie Oil, he was also telling the truth when he denied robbing the Dollar General.  Given that Jacob deliberately elicited testimony that he had committed another armed robbery, we cannot agree that he suffered any marginal prejudice—much less "clear and compelling prejudice"—from a stipulation to an unspecified prior felony conviction.

¶30.    In summary, the doctrine of "retroactive misjoinder" does not apply simply because a jury acquits a defendant on one count of an otherwise valid multi-count indictment.  And even if the doctrine did apply, Jacob cannot demonstrate that joinder of the charges resulted in "clear and compelling prejudice."  Accordingly, this issue is without merit.

## II.    Weight and Sufficiency of the Evidence

¶31.    Jacob next argues that there was insufficient evidence to support the verdict on Count II because "[t]he evidence failed to establish beyond a reasonable doubt that [he]—or his accomplice—took any personal property from Audria Brown's person or presence."  In the

12

alternative, he also argues that he is entitled to a new trial on Count II because the jury's verdict is against the overwhelming weight of the evidence. Jacob does not challenge the sufficiency or weight of the evidence as to Count I.

¶32. The standard of review applicable to each issue is well settled. When a defendant challenges the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Bush v. State*, 895 So. 2d 836, 843 (¶16) (Miss. 2005) (quoting *Jackson v. Virginia*, 443 U.S. 307, 315 (1979)). The issue on appeal is not whether the reviewing court would have found the defendant guilty; rather, the conviction must be affirmed if there was sufficient evidence for "any rational trier of fact" to have rendered a guilty verdict. *Id.* "When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id.* at 844 (¶18). The evidence must be "[v]iewed in the light most favorable to the verdict," and we will affirm unless "[t]he trial court . . . abuse[d] its discretion in denying a new trial[.]" *Id.* at (¶19).

¶33. "The elements of armed robbery are: (1) a felonious taking or attempt to take; (2) from the person or from the presence; (3) the personal property of another; (4) against his will; (5) by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon." *Cowart v. State*, 178 So. 3d 651, 666 (¶42) (Miss.

13

2015). Thus, in evaluating Jacob's challenge to the sufficiency of the evidence on Count II, we must consider whether the State presented sufficient evidence for a rational trier of fact to find these essential elements of the offense beyond a reasonable doubt. Focusing solely on the second element enumerated above, Jacob argues that there is no evidence that he or his accomplice took anything "from the person or presence" of Audria because she fled to a stockroom as soon as the men burst into the Dollar General.

¶34. In *Towner v. State*, 812 So. 2d 1109 (Miss. Ct. App. 2002), this Court addressed a similar scenario of a defendant convicted of two counts of armed robbery after he took a single sum of money that belonged to one business. Towner robbed an employee and one of the owners of Toucan's restaurant in Gulfport by holding the two women at gunpoint, ordering them into the restaurant's office, and demanding about $2,000 that was on the desk, in money bags, and in a register drawer. *Id.* at 1110-11 (¶¶1-4). On appeal, Towner argued "that since the property taken from each victim was the identical property," there could "be only one robbery." *Id.* at 1113 (¶16). In rejecting Towner's argument, this Court first held that under the plain language of the robbery statute, Miss. Code Ann. § 97-3-79 (Rev. 2014), *ownership* of the property taken is unimportant; what the State must prove is that property was taken from the person or presence of the victim. *See Towner*, 812 So. 2d at 1113 (¶18). We held that "[r]obbing two people of one item of property at gunpoint while the property is within their proximity and control, even if *neither* of them owns it, may be two robberies." *Id.* at 1114 (¶23). This is because a robbery is a crime against a specific *person*—unlike

14

larceny, which is a crime against specific property. *Id.*

¶35.    Of particular significance to Jacob's argument in this case, this Court's opinion in *Towner* also adopted the following "logical explanation" of what it means to take property "from the person of presence" of another:

> [T]he phrase "from the presence" or "in the presence" has been construed in a number of cases. *"Presence" in this connection is not so much a matter of eyesight as it is one of proximity and control: the property taken in the robbery must be close enough to the victim and sufficiently under his control that, had the latter not been subjected to violence or intimidation by the robber, he could have prevented the taking.*

*Id.* at 1113 (¶19) (emphasis added) (quoting Wayne R. LaFave & Austin W. Scott Jr., *Substantive Criminal Law* 443, § 8.11(c) (1986)).

¶36.    Jacob argues that this case is factually distinguishable from *Towner* because Towner held a gun on both victims and took possession of the money while in the immediate physical presence of both. In contrast, Jacob and his accomplice may not have even seen Audria. Jacob also emphasizes that he and his accomplice took money from Lakisha and from the safe and not from Audria's register.

¶37.    We conclude, however, these factual distinctions do not remove the case from *Towner*'s definition of the key phrase "from the presence." Audria testified that as she started to return to her register to ring up a customer, she saw the two robbers rushing into the Dollar General. She could tell at least one of them was wearing a mask, and she perceived that he was holding a gun. Because of her understandable fear, she ran to the back of the store and hid in the stockroom with two other customers. As *Towner* explained, for

15

purposes of our State's robbery statute, "'[p]resence' . . . is not so much a matter of eyesight as it is one of proximity and control: the property taken in the robbery must be close enough to the victim and sufficiently under his control that, *had the latter not been subjected to violence or intimidation by the robber*, he could have prevented the taking." *Id.* (emphasis added). If the robbers had not so intimidated Audria that she fled to the stockroom, she would have been in a position to prevent the taking of money from the safe, which was located at the front of the store near her register. The fact that no money was taken from Audria's register[4] or while the robbers were in Audria's immediate physical presence is of no moment.

¶38. Under our decision in *Towner*, the State presented sufficient evidence that money was taken from Audria's "presence" within the meaning our robbery statute.[5] Accordingly, Jacob's challenge to the sufficiency of the evidence is without merit. Jacob's weight-of-the-evidence argument merely incorporates by reference his challenge to the sufficiency of the evidence. Accordingly, that argument is also without merit.

### III. Double Jeopardy

¶39. Jacob also argues that his conviction on two counts of armed robbery for taking the

---

[4] The State presented evidence that at least some of the money in the safe had been placed there by Audria during the course of the day. This evidence was not necessary to support the conviction. Jacob's challenge to the conviction fails because the State presented evidence that Audria would have been in a position to prevent the taking of her employer's money—regardless of who put it in the safe—had she not fled in fear of the robbers.

[5] The jury was instructed on *Towner*'s definition of "presence."

16

same money violates the protections against double jeopardy[6] found in the Fifth Amendment to the United States Constitution and Article III, Section 22 of the Mississippi Constitution, which both prohibit multiple convictions for "the same offense."[7] However, in *Towner*, we rejected the same argument. *Towner*, 812 So. 2d at 1114 (¶¶22-23). We held that Towner was not being punished twice for the "same" offense because there was "a different element in each offense"—a different victim. *Id.* at (¶22) (applying the "well-established test . . . found in *Blockburger v. United States*, 284 U.S. 299, 304 (1932)").

¶40. Jacob relies on the *Towner* dissent, *see id.* at 1116-18 (¶¶34-53) (King, P.J., dissenting), and essentially asks us to overrule *Towner*. However, *Towner*'s analysis of the issue is sound and has not been called into question.[8] Accordingly, Jacob's conviction on

---

[6] Under the "concurrent sentence doctrine," federal courts have sometimes declined to review a claim that one of two concurrent sentences violates double jeopardy, reasoning that "the existence of one valid sentence makes unnecessary the review of other sentences that run concurrently with it." *Davis v. Thaler*, 373 F. App'x 446, 450 (5th Cir. 2010); *accord Towner*, 812 So. 2d at 1115 (¶26). However, the United States Supreme Court has held that this doctrine is inapplicable when separate and cumulative fines are imposed for each conviction, even if the defendant's prison sentences are ordered to run concurrently. *See Ray v. United States*, 418 U.S. 736 (1987) (per curiam). In this case, it appears that the sentencing order on Count II required Jacob to pay a $1,000 fine in addition to all fines and assessments on Count I. Accordingly, even assuming that Mississippi law recognizes the concurrent sentence doctrine, we must address Jacob's double jeopardy claim on the merits.

[7] Although these provisions could have different meanings, the Mississippi Supreme Court has stated that it will "construe the double jeopardy clause of our Constitution consistent with authoritative constructions of the Constitution of the United States." *Lee v. State*, 469 So. 2d 1225, 1228 (Miss. 1985) (citing *Sanders v. State*, 429 So. 2d 245, 251-52 (Miss. 1983)).

[8] In *Culp v. State*, 933 So. 2d 264, 280-81 (¶56) (Miss. 2005), the Supreme Court stated that our decision in *Towner* "correctly applied" "the *Blockburger* test."

17

two counts of armed robbery does not violate the double jeopardy provisions of the Mississippi Constitution or the United States Constitution.

## CONCLUSION

¶41.    Jacob is not entitled to a new trial based on the doctrine of retroactive misjoinder, there is sufficient evidence to support his convictions, the verdict is not against the weight of the evidence, and his convictions and sentences do not violate double jeopardy.

¶42.    **AFFIRMED.**

**LEE, C.J., GRIFFIS, P.J., BARNES, CARLTON, FAIR, GREENLEE AND WESTBROOKS, JJ., CONCUR.    IRVING, P.J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.**