# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-01014-COA

**DEMANTREAS LOVE A/K/A DEMANTREOUS LOVE**  **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**  **APPELLEE**

DATE OF JUDGMENT:              06/02/2021
TRIAL JUDGE:                   HON. BARRY W. FORD
COURT FROM WHICH APPEALED:     HOLMES COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:        OFFICE OF STATE PUBLIC DEFENDER
                               BY: JUSTIN T. COOK
ATTORNEY FOR APPELLEE:         OFFICE OF THE ATTORNEY GENERAL
                               BY: BARBARA BYRD
DISTRICT ATTORNEY:             AKILLIE MALONE-OLIVER
DISPOSITION:                   AFFIRMED IN PART; REVERSED AND
                               RENDERED IN PART - 09/19/2023
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., WESTBROOKS AND EMFINGER, JJ.**

**EMFINGER, J., FOR THE COURT:**

¶1.     On May 17-19, 2021, Demantreas Love was tried and convicted of capital murder, aggravated assault, and three counts of armed robbery in the Circuit Court of Holmes County, Mississippi. Love appeals his convictions and sentences.

## FACTS

¶2.     A Holmes County grand jury returned a six-count indictment charging Pretzea Love, Demantreas Love, and Jamar Newsome with the capital murder of Vernardo Washington, the aggravated assault of Joe Holmes, and the armed robberies of Clifton Holmes, Curtis Aldridge, and Vernardo Washington. Pretzea Love, alone, was charged with possession of

a firearm by a felon (Count V). Pretzea and Demantreas, who are brothers, were jointly tried and Newsome testified at their trial as a State's witness.

¶3.    The charges arose as the result of an incident that occurred just outside of Cruger, Mississippi, at Club CJ's. Curtis Aldridge and Melvin Waddell were co-owners of Club CJ's, which is located in Holmes County, Mississippi. The club had a bar and a cooler, shelves for storage, and a sink located behind the bar. There was a sixty-inch television behind the bar that lit up the area. A booth was built up so the disc jockey (DJ) could see over the crowd on the dance floor, which had a railing around it. Club CJ's had a pool table, which was used on the night of the incident for a dice game. There was an open seating area with tables and chairs. The events at issue occurred during the late evening hours of July 1, 2017, and the early morning hours of July 2, 2017. Aldridge opened the club at about 9:30 p.m. on July 1 to let the DJ, Washington, set up his equipment. Washington was being paid to work a five-night run at the club, beginning that night. About 100 people came into the club that evening.

¶4.    Joe Holmes ran the dice game for the club and helped Aldridge count the money at the end of the night. That night, there were sixteen to seventeen people shooting dice. Joe's cousin Clifton Holmes won about $1,200. Newsome, who had known the Love brothers (Pretzea and Demantreas) for over twenty years, testified that Demantreas lost between $1,000 and $1,500. Newsome said that he did not come to the club with the Love brothers and that he stayed mostly on the dance floor all night. However, other witnesses placed him at the dice game beside Demantreas during the evening. Pretzea, who was described as being about six feet, eight inches tall with long braids or dreadlocks, stood out in the crowd.

2

¶5.    Newsome testified the Loves told him that "they was shooting dice and it went wrong and said folks took their money or whatever, and they was going to take their money back." They told Newsome they were going to take their money back when the club was closing, and the Loves told him they wanted him to be their lookout.

¶6.    According to Joe Holmes, the dice game ended around 3 a.m., and he started his closing routine. At that point, the crowd had died down, and there were only a few people inside the club. Newsome testified that after agreeing with the Loves that he would serve as a lookout, he re-entered the club and went to get some cigarettes. According to Newsome, as he was walking back from the bathroom, "they were coming in. Three of them went towards the bar and one of them went towards the DJ booth."[1] Several witnesses described the chaotic, fast-moving sequence of events that followed.

¶7.    Joe Holmes and Aldridge were behind the bar, at each end, getting ready to count the club's money from the evening. Clifton Holmes was sitting in the middle of the bar counting his winnings. Aldridge testified that Pretzea came behind the bar where he was standing, pointed a gun at him, and told him to back away from the money. Aldridge backed away, lay down on the floor facing the wall, and started praying. Aldridge said Joe would not have been able to see Pretzea when Pretzea confronted Aldridge. Pretzea then continued along the bar and confronted Clifton. He pointed the gun at Clifton and demanded his money. Clifton gave Pretzea his money and then dropped to his knees. Pretzea then continued to the other

---

[1] Newsome's statement would seem to indicate at least two others acted in concert with the Loves, but he was never asked to identify the others involved or those four persons he saw "coming in."

end of the bar, pointed the gun at Joe's head, and demanded that Joe give him the money. Joe gave him the money and immediately jumped over the bar to get away from Pretzea.

¶8. When Joe jumped over the bar, he landed on Demantreas. During the process, Pretzea shot Joe in his right side. As Pretzea tried to get Joe off his brother, Demantreas was telling Pretzea to "shoot him, shoot him, finish him, go on and shoot him." When Pretzea got Joe off Demantreas, Pretzea "shot him some more and shot towards where the DJ was." Newsome testified he saw someone struggling with Washington and that he saw Pretzea shoot Washington. Newsome and the Love brothers fled in separate vehicles.

¶9. From his position on the floor facing the wall, Aldridge could not see anything, but he heard a commotion and three rounds of gunshots: "The first round was like three or four shots. And the next time, it was like three or four shots. And the next time, it was like six to eight shots." Aldridge said he lay on the floor for about three minutes and then got up because he was not hearing anything. Aldridge stated that he first made sure everyone was out of the club and then walked to the end of the bar where he saw Washington lying face down on the floor. Clifton told Aldridge that Washington was "gone." Aldridge did not see Joe until he went outside and discovered that Joe had also been shot. Aldridge called his wife and told her to call 911 and Washington's family.

¶10. Washington's family took him to the hospital before an ambulance arrived. Washington had six gunshot wounds, with the lethal wound being a close-contact wound under his armpit that traveled through a rib and his left lung. Joe Holmes was taken to the local hospital. He was later transferred to the University of Mississippi Medical Center in

4

Jackson. Joe was in the hospital for about three weeks and testified that it took him about six months to recover from his gunshot wound.

¶11. At the conclusion of the trial, Demantreas was found guilty of all five counts against him. He was sentenced to a term of life imprisonment without eligibility for parole in the custody of the Mississippi Department of Corrections for capital murder, as charged in Count I; to a term of twenty years in custody for aggravated assault, as charged in Count II; to a term of thirty years in custody for the armed robbery of Clifton Holmes, as charged in Count III; and to a term of thirty years in custody for the armed robbery of Vernardo Washington, as charged in Count VI. The sentences for Counts I and II were ordered to run concurrently with one another. The sentences for Counts III and VI were ordered to run concurrently with one another but consecutively with the sentences for Counts I and II. As will be discussed below, the conviction for the armed robbery of Curtis Aldridge, as charged in Count IV, was merged with the capital murder conviction (Count I), as the underlying felony. We now address the issues Demantreas raises on appeal.

## ANALYSIS

### I. The trial court did not err by denying Demantreas' motion to sever.

¶12. On May 7, 2021, Demantreas filed a motion for severance pursuant to Mississippi Rule of Criminal Procedure 14.3. In the motion, he asserted the State's discovery showed that "the weight of the evidence against co-defendants in this matter is extreme when compared to that of" Demantreas. The trial court denied the motion after a hearing on May 10, 2021. The order denying the motion indicates that the trial court heard the arguments of counsel,

5

but the order does not indicate that any testimony or proof was offered in support of the motion. No transcript of that hearing appears in the appellate record.

¶13.    Concerning the grant or denial of a motion for a severance, this Court stated in *Pope v. State*, 330 So. 3d 409, 424 (¶¶65-66) (Miss. Ct. App. 2021):

> Two or more defendants may be charged in a single indictment when each defendant is charged with accountability for each offense charged. MRCrP 14.2(b)(1). "The court may, on motion of the state or a defendant, grant a severance of defendants or offenses if it is deemed appropriate to promote the fair determination of a defendant's guilt or innocence of each offense." MRCrP 14.3(a)(2); *accord* Miss. Code Ann. § 99-15-47 (Rev. 2020). However, "[d]efendants jointly indicted for a felony are not entitled to separate trials as a matter of right." *Hayes v. State*, 168 So. 3d 1065, 1074 (¶34) (Miss. Ct. App. 2013). "[W]hether a severance should be granted is addressed to the sound discretion of the trial judge." *Price v. State*, 336 So. 2d 1311, 1312 (Miss. 1976).
>
> When considering a motion to sever, a trial court must analyze the factors provided by our Supreme Court in *Duckworth v. State*, 477 So. 2d 935, 937 (Miss. 1985). First, the court must look to whether a co-defendant's testimony tends to exculpate himself at the expense of his co-defendant. *Id*. In other words, the court looks to whether there "appear[s] to be a conflict of interest among the co-defendants." *Id*. Next, the court determines whether "the balance of the evidence introduced at trial go[es] more to the guilt of one defendant than to the others." *Id*. The denial of a severance only becomes error when the defenses of the co-defendants are adverse to one another. *Rigby v. State*, 485 So. 2d 1060, 1061 (Miss. 1986).

¶14.    Demantreas contends that the trial court abused its discretion by denying the motion for severance. He supports his argument on appeal exclusively with trial testimony; however, the motion was heard and decided prior to trial. Therefore, the trial court's discretion could not have been exercised based upon trial testimony. Because the record does not contain a transcript of the pre-trial hearing on the motion, we do not know what information was presented to the trial court at that time. In *Hunt v. State*, 81 So. 3d 1141, 1143 (¶5) (Miss. Ct.

6

App. 2011), this Court explained:

> "This Court cannot assign error to actions not made a part of the record." *Qualls v. State*, 947 So. 2d 365, 370 (¶12) (Miss. Ct. App. 2007). "It is the responsibility of the appellant to designate the record pursuant to Rule 10(b) of the Mississippi Rules of Appellate Procedure in a manner sufficient to allow this Court to review the appellant's issues." *Walker v. State*, 49 So. 3d 658, 659 (¶6) (Miss. Ct. App. 2010) (citing *Austin v. State*, 971 So. 2d 1286, 1287 n.1 [(¶5)] (Miss. Ct. App. 2008)).

Without more, we must presume the trial court properly exercised its discretion in denying the motion for severance. *See Chandler v. State*, 345 So. 3d 632, 641 (¶20) (Miss. Ct. App. 2022).

## II.     The trial court did not err by denying Demantreas' motion for a mistrial.

¶15.    Prior to the beginning of voir dire, outside the presence of the venire, the trial judge became aware that Demantreas had a prosthetic leg. Demantreas advised the trial judge that he could not walk in shackles. The court then instructed the bailiff to use restraints on his wrists once he was in the courtroom. Even though the counsel table was draped, the trial judge instructed the bailiff to cover the restraints with a towel or a pad. The trial judge required that the venire not be brought in until Demantreas was seated and situated at the counsel table. These instructions were given on the record in the presence of Demantreas and his counsel without objection.[2]

¶16.    Near the end of the State's voir dire examination, after the trial judge was advised that

---

[2] In his brief, appellate counsel raises several objections to the use of restraints, including wrist restraints, that were not raised at trial. Because no objection was made to the use of these restraints, this issue was waived. *See Smith v. State*, 877 So. 2d 369, 378-79 (¶¶14-18) (Miss. 2004).

Demantreas needed to take a restroom break, the trial judge attempted to allow the State to conclude its voir dire of the jury. As the State continued its questioning of the venire, the bailiff went to the counsel table and began to free Demantreas from the wrist restraints. At that point, defense counsel approached the bench and raised an objection. The trial judge had the bailiff remove the venire from the courtroom. Trial counsel moved for a mistrial and stated that the jury had seen the deputy sheriff "bend down to release the shackles" and argued that portions of the venire could clearly see and hear that Demantreas was being released from restraints.

¶17.    The trial court ruled:

> That motion will be denied. The Court is of the opinion that there has been no prejudice to you in this case. That the defendant was behind a draped table. And even though the sheriff bent down - - let the record reflect that we're in a make-shift chambers. That it is raining, that the panel could not go out into the rain. So the Court is of the opinion that there has been no prejudice to you. The indictment indicates they were charged with murder, aggravated assault, armed robbery, and because they were charged with these violent crimes, it would be reasonable to potential jurors that they were probably already incarcerated. Because I'm of that opinion, the motion for mistrial is denied.

¶18.    Counsel on appeal argues that Demantreas was prejudiced by being visibly restrained in the presence of the venire. In *Smith*, 877 So. 2d at 379 (¶17), the supreme court held:

> Generally, a defendant has the right to appear before his jury free of shackles or handcuffs. *Brown v. State*, 798 So. 2d 481, 501 (Miss. 2001); *Rush v. State*, 301 So. 2d 297, 300 (Miss. 1974). However, where there is a risk of escape or the possibility of harm to other persons, restraint devices may be used in the judge's discretion. *Id.*
>
> . . . Smith has presented no evidence that his defense suffered any negative consequence from the fact that he was restrained during the trial.

Clearly the trial judge found the use of restraints necessary based on the nature of the

8

charges. The trial judge took precautions to shield the use of restraints from the venire. When the motion for a mistrial was made, counsel made no claim of prejudice other than the venire's mere knowledge of the use of restraints.

¶19. In *Payton v. State*, 897 So. 2d 921, 932 (¶16) (Miss. 2003), the supreme court considered the issue of the jury's knowledge of the use of restraints and stated:

> This Court has routinely upheld the trial court's refusal to grant a mistrial even in cases where the record affirmatively shows that jurors actually saw the defendant in restraints. *See, e.g.*, *Brown v. State*, 690 So. 2d 276, 287 (Miss. 1996) (defendant restrained because of safety concerns); *Davenport v. State*, 662 So. 2d 629 (Miss. 1995); *Wiley v. State*, 582 So. 2d 1008 (Miss. 1991). In addition, without a showing of prejudice, this Court has generally been unwilling to reverse a conviction on these grounds. *See Lockett v. State*, 517 So. 2d 1317, 1329 (Miss. 1987) (defendant brought into courtroom with handcuffs on his wrists and ankles); *Hickson v. State*, 472 So. 2d [379,] 383 [(Miss. 1985)](defendant was handcuffed in the presence of the jury for between thirty minutes and an hour).

¶20. Our standard of review for a trial court's denial of a motion for a mistrial was stated in *Liddell v. State*, 361 So. 3d 152, 155-56 (¶17) (Miss. Ct. App. 2023):

> "Whether to grant a motion for a mistrial is within the sound discretion of the trial court." *Smith* [*v. State*], 158 So. 3d [1182,] 1185 (¶9) [(Miss. Ct. App. 2015)] (quoting *Gunn v. State*, 56 So. 3d 568, 571 (¶14) (Miss. 2011)). "The trial judge is permitted considerable discretion in determining whether a mistrial is warranted since the judge is best positioned for measuring the prejudicial effect." *Tate v. State*, 912 So. 2d 919, 932 (¶41) (Miss. 2005). The Mississippi Supreme Court has stated that "[a] trial judge need declare a mistrial only when there is an error in the proceedings resulting in substantial and irreparable prejudice to the defendant's case." *Hutto v. State*, 227 So. 3d 963, 984 (¶66) (Miss. 2017); *see also* MRCrP 23.5 (governing mistrials).

We find that substantial and irreparable prejudice to the defendant's case did not result from the brief exposure of Demantreas in wrist restraints or by some potential juror's knowledge that restraints were being used. Accordingly, the trial court did not abuse its discretion by

denying the motion for a mistrial.

> **III. Count I of the indictment, charging Demantreas with capital murder, is legally sufficient, and the trial court did not err in its instruction to the jury as to this count.**

¶21. Count I of the amended indictment charged as follows:

> [Demantreas Love] on or about the 2nd day of July, 2017, in Holmes County, Mississippi, did unlawfully, feloniously, willfully, and maliciously aid and abed [sic] without authority of law and with or without deliberate design to effect death, kill and murder Vernardo Washington, a human being, while engaged in an armed robbery, while in [Cruger], Mississippi, in violation of Section 97-3-19(2)(e) of the Mississippi Code of 1972, as amended, which offense is punishable by death or by imprisonment for life and against the peace and dignity of the State of Mississippi.

Demantreas alleges that Count I was "broad, nebulous, and failed to adequately inform Demantreas of what the State intended to allege at trial." He argues that the indictment was vague by failing to "allege a victim," and therefore, the language of Count I fails to meet the notice requirements of Mississippi Rules of Criminal Procedure 14.1, the right to due process, and the protections of the constitution. He further asserts that the court's jury instruction for Count I allowed the State to constructively amend the indictment by naming Curtis Aldridge as the alleged victim of the armed robbery when the grand jury did not do so.

¶22. Concerning our standard of review regarding a challenge to the sufficiency of an indictment charging capital murder, the supreme court explained in *Carson v. State*, 212 So. 3d 22, 31 (¶¶34-36) (Miss. 2016):

> The sufficiency of an indictment is a question of law, and therefore is reviewed de novo. *Berry v. State*, 996 So. 2d 782, 785-86 (¶8) (Miss. 2008) (quoting *Quang Thanh Tran v. State*, 962 So. 2d 1237, 1240 (Miss. 2007)). "So long as

10

a fair reading of the indictment, taken as a whole, clearly describes the nature and cause of the charge against the accused, the indictment is legally sufficient." *Farris v. State*, 764 So. 2d 411, 421 (¶28) (Miss. 2000) (citing *Harrison v. State*, 722 So. 2d 681, 687 (Miss. 1998)).

. . . A criminal defendant has a constitutional right "to be informed of the nature and cause of the accusation[ ]" against him. U.S. Const. amend. IV; *see also* Miss. Const. art 3, § 26 (1890). **An indictment which tracks the language of the criminal statute is sufficient to place the defendant on notice of the charge against him.** *Batiste* [*v. State*], 121 So. 3d [808,] 836 (¶43) [(Miss. 2013)] (citing *Stevens v. State*, 808 So. 2d 908, [919] [(¶31)] (Miss. 2002)). **Regarding capital-murder cases**, for which both Batiste and Carson were charged, **"unless the underlying felony is burglary, 'the underlying felony that elevates the crime to capital murder must be identified in the indictment along with the section and subsection of the statute under which the defendant is being charged.' . . . No further detail is required."** *Id*. (quoting *Goff v. State*, 14 So. 3d 625, 665 [(¶176)] (Miss. 2009); Miss. Code Ann. § 99-17-20).

(Emphasis added).

¶23.    Capital murder is defined in Mississippi Code Annotated section 97-3-19(2)(e) (Supp. 2017) as "[t]he killing of a human being without the authority of law by any means or in any manner . . . [w]hen done with or without any design to effect death, by any person engaged in the commission of the crime of . . . robbery." Count I of the indictment tracks the language of and cites section 97-3-19(2)(e) as required by the supreme court's decision in *Carson*, so no additional detail is required. While Demantreas argues that the indictment fails to allege a victim, Vernardo Washington is clearly identified as the victim of capital murder. To the extent he contends that it was necessary to identify the victim of the armed robbery, in *Green v. State*, 235 So. 3d 1438, 1440 (¶6) (Miss. Ct. App. 2017), this Court applied the holding in *Carson* and noted:

Furthermore, the attack on the capital murder indictment is based on *Rowland*

11

*v. State*, 98 So. 3d 1032, 1038-39 (¶12) (Miss. 2012), which had held that a capital murder indictment must name the victim of the underlying felony. But *Rowland* was overruled on that point by *Carson v. State*, 212 So. 3d 22, 32-34 (¶¶37-40) (Miss. 2016). The identity of the victim of the underlying crime is not an element of capital murder. *Id*. Thus, Green's indictment did not fail to allege an essential element of either capital murder count.

Although Count I of the indictment did not name Curtis Aldridge as the victim of the underlying armed robbery, we find that Count I of the indictment was legally sufficient to charge Demantreas with capital murder.

¶24.     Demantreas then continues by arguing that "Instruction S-2, the State's elements instruction on Count I[,] provided in pertinent part that the jury could convict Demantreas of capital murder if it found that among other things, Vernardo Washington was killed while Demantreas was committing the crime of armed robbery of Curtis Aldridge."[3] He argues that because the name of the victim of the armed robbery is not contained in Count I, Jury Instruction S-2 constructively amended the indictment since it "deviates from the language of the State's indictment substantially."

¶25.     As discussed above, the name of the alleged victim of the underlying armed robbery is not required to be included in an indictment for capital murder pursuant to section 97-3-19(2)(e). However, the jury must be instructed as to the elements of armed robbery, including the name of the alleged victim. *Waldrop v. State*, 247 So. 3d 364, 366 (¶¶6-10) (Miss. Ct. App. 2018) (reversing a defendant's conviction of capital murder and remanding because the jury had not been instructed on the elements of the underlying felony of armed robbery).

---

[3] The State's proposed Instruction S-2 was accepted by the trial court and was given to the jury as Jury Instruction No. 26.

¶26.    In a recent case, a defendant, Chisholm, was convicted of capital murder for killing Shauna Witt after breaking into a business building "with the intent to commit an assault therein." *Chisholm v. State*, 365 So. 3d 229, 243 (¶57) (Miss. 2023). On appeal, Chisholm argued, as Demantreas does in the present case, that the indictment was defective for its failure to identify the intended victim of the alleged underlying felony (assault) and that the jury instruction constructively amended the indictment by naming the victim.[4] *Id*. at 243-44 (¶57). In affirming Chisholm's conviction, the supreme court addressed these arguments by stating:

> Chisholm also argues that the eventual jury instruction on burglary "agrees with [his] argument" because it instructed that the jury had to find Chisholm broke and entered the Wal-Mart building "with the intent to shoot Shauna Witt." According to Chisholm this instruction "constructively amended" the indictment. But Chisholm is incorrect as to the definition of a constructive amendment. "[A] constructive amendment of the indictment occurs when the proof and instructions broaden the grounds upon which the defendant may be found guilty of the offense charged so that the defendant may be convicted without proof of the elements alleged by the grand jury in its indictment." *Bell v. State*, 725 So. 2d 836, 855 (Miss. 1998) (emphasis added) (citing *United States v. Miller*, 471 U.S. 130 (1985)). And here the jury instruction only further narrowed the grounds upon which the jury could find Chisholm guilty.

The supreme court found that Chisholm's indictment was not defective, citing *Carson*, and that the jury instruction did not effectively amend the indictment. *Id*. at 244 (¶58).

¶27.    In this case, Count I was not defective by failing to identify the alleged victim of the underlying felony (armed robbery). Further, the jury instruction relevant to Count I did not constructively amend the indictment. These arguments are not persuasive.

---

[4] Chisholm also argued the indictment was insufficient because it did not specify the type of assault. *Id*. at 244 (¶57).

**IV.    The evidence was not legally sufficient to support the conviction of armed robbery in Count VI.**

¶28.    Demantreas contends that the evidence was legally insufficient to support his conviction for the armed robbery of Vernardo Washington, as charged in Count VI of the indictment. He argues that "the State's evidence at trial failed to show that anything was taken from Washington or that anyone ever attempted to take anything from Washington." We set forth our standard of review for a challenge to the legal sufficiency of the evidence in *Alvarado v. State*, 343 So. 3d 391, 396 (¶10) (Miss. Ct. App. 2022):

> "In reviewing a challenge to the legal sufficiency of the evidence, we consider all of the evidence in the light most favorable to the prosecution and accept all evidence supporting the verdict as true." *Dampeer v. State*, 989 So. 2d 462, 464 (¶7) (Miss. Ct. App. 2008). We then determine, based on the evidence, whether reasonable, fair-minded jurors could have found the defendant guilty. *Goldman v. State*, 406 So. 2d 816, 819 (Miss. 1981). That is, "whether a reasonable juror could rationally say that the State" "proved each element of the crime." *Lenoir v. State*, 222 So. 3d 273, 279 (¶25) (Miss. 2017) (citing *Poole v. State*, 46 So. 3d 290, 293-94 (¶10) (Miss. 2010)).

¶29.    In *Jones v. State*, 281 So. 3d 137, 146 (¶26) (Miss. Ct. App. 2019), we stated:

> "The essential elements of armed robbery are: (1) a felonious taking or attempt to take, (2) from the person or from the presence, (3) the personal property of another, (4) against his will, (5) by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon." *Oliver v. State*, 234 So. 3d 443, 445 (¶11) (Miss. Ct. App. 2017), *cert. denied*, 233 So. 3d 822 (Miss. 2018).

Count VI of the indictment, as amended, charged as follows:[5]

---

[5] Prior to trial, Count VI was amended to remove (as surplus language) a reference to "Lexington, Mississippi." Count VI was also amended to replace the name of "Clifton Holmes" with the name "Vernardo Washington," where Washington had been identified as the victim earlier in the count. It should also be noted that the indictment originally included in the appellate record contained an erroneous third page upon which Count VI purportedly concluded. Upon order of this Court, the trial court provided the full, true, and correct copy

[Demantreas] on or about the 2nd day of July, 2017, in Holmes County, Mississippi did unlawfully and feloniously aid and abed [sic] to take from Vernardo Washington property, United States currency, from his person against his will by violence and put Vernardo Washington in fear of immediate injury by the exhibition of a firearm, in violation of Section 97-3-79 of the Mississippi Code of 1972, as amended, against the peace and dignity of the State of Mississippi."

¶30. As noted above, the jury instruction as to Count VI read, in part, that Demantreas, acting in concert with others,

> did unlawfully, willfully and feloniously take and carry away from the person of or from the presence of Vernardo Washington, certain personal property, to wit: good and lawful U.S. Currency or any property of Vernardo Washington . . . .

¶31. According to Newsome and the acts other eyewitnesses described, it is clear that the Loves' plan was to come back to the club at closing and steal money. Based upon Newsome's testimony, they may have had others acting in concert with them. Newsome testified that when they came in, he saw one walk toward the DJ booth and later he saw "the DJ scuffling with another person." There was a reasonable inference from the evidence that, during the struggle, Washington suffered a close-contact gunshot wound that caused his death. However, there is no evidence that any of *Washington's* property was taken.

¶32. The jury instruction differs from the indicted charge in some respects. While the indictment charged that the property was taken from Washington's person, the instruction added the statutory language "or from the presence" of Washington. Further, while the indictment does not specifically identify the ownership of the property taken, the instruction

---

of the indictment to supplement the record, which included the correct final page of the indictment.

requires the jury to find beyond a reasonable doubt that it was *Washington's* property that was actually taken.

¶33.    In *Morton v. State*, 246 So. 3d 895, 904 (¶24) (Miss. Ct. App. 2017), this Court explained:

> "[I]n Mississippi both an attempt to take and an actual taking of another's personal property against his will by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon constitutes robbery." *Houston v. State*, 811 So. 2d 371, 372 (¶4) (Miss. Ct. App. 2001) (quoting *Harris v. State*, 445 So. 2d 1369, 1370 (Miss. 1984)).

While the State could have charged Demantreas with armed robbery by "attempting to take" Washington's property, neither the indictment nor the instruction gave the jury that option.

¶34.    The State argues that this case is similar to other cases where a business was being robbed and multiple employees were present during the robbery. In *Reynolds v. State*, 227 So. 3d 428, 436 (¶34) (Miss. Ct. App. 2017), this Court stated:

> In *Towner v. State*, 812 So. 2d 1109 (Miss. Ct. App. 2002), this Court addressed a similar scenario of a defendant convicted of two counts of armed robbery after he took a single sum of money that belonged to one business. Towner robbed an employee and one of the owners of Toucan's restaurant in Gulfport by holding the two women at gunpoint, ordering them into the restaurant's office, and demanding about $2,000 that was on the desk, in money bags, and in a register drawer. *Id*. at 1110-11 (¶¶1-4). On appeal, Towner argued "that since the property taken from each victim was the identical property," there could "be only one robbery." *Id*. at 1113 (¶16). In rejecting Towner's argument, this Court first held that under the plain language of the robbery statute, Miss. Code Ann. § 97-3-79 (Rev. 2014), ownership of the property taken is unimportant; what the State must prove is that property was taken from the person or presence of the victim. *See Towner*, 812 So. 2d at 1113 (¶18). We held that "[r]obbing two people of one item of property at gunpoint **while the property is within their proximity and control**, even if neither of them owns it, may be two robberies." *Id*. at 1114 (¶23). This is because a robbery is a crime against a specific person—unlike larceny, which is a crime against specific property. *Id*.

(Emphasis added). According to the State, Washington was an employee of Club CJ,[6] therefore, the taking of Club CJ's money from Aldridge is sufficient.[7] However, this argument ignores the fact that the indictment charged that the property was taken from the "person" of Washington, and the jury instruction required the jury to find that *Washington's* property was taken, not the club's property. Because there was no evidence from which a reasonable and fair-minded jury could have found beyond a reasonable doubt that any of Washington's property was taken, the armed robbery conviction in Count VI is reversed and rendered.

**V.**     **Demantreas was not placed in double jeopardy by his multiple convictions for armed robbery and capital murder during an armed robbery.**

¶35. Under this assignment of error, Demantreas cites the constitutional prohibition against double jeopardy and argues that his three armed robbery convictions violate his constitutional rights. He correctly states that the supreme court's ruling in *Meeks v. State*, 604 So. 2d 748, 754 (Miss. 1992), clearly prohibits convictions for both capital murder and the capitalizing felony. He then asserts that because the capitalizing felony of armed robbery in the capital murder charge in Count I did not name a victim, all three armed robbery convictions must

---

[6] In *Reynolds* and *Towner*, the victims were actual employees who had some responsibility for or "control" of the funds that were taken. *Reynolds*, 227 So. 3d at 436 (¶34); *Towner*, 812 So. 2d at 1114 (¶23). Here, Washington had been hired as a DJ for five nights. There is no evidence that he was given any responsibility for or **control** over the club's money.

[7] The State also refers to the taking of money from Clifton Holmes as support for Demantreas' conviction. However, the indictment charges, and the evidence shows, that it was Clifton's winnings (not the club's money) that was taken from Clifton.

17

be reversed and rendered.

¶36.  It is true that the jury found Demantreas guilty of capital murder as charged in Count I, with the underlying felony being the armed robbery of Curtis Aldridge, and that the jury found Demantreas guilty of the armed robbery of Curtis Aldridge as charged in Count IV. However, at sentencing, the trial judge merged the conviction in Count IV with the conviction in Count I. This was done in compliance with the supreme court's direction in *McGlasten v. State*, 328 So. 3d 101, 108 (¶29) (Miss. 2021):

> The correct and widely followed approach to dealing with multiplicitous counts is to merge the wrongly charged multiplicitous counts into one single count of conviction.

Thus there are not two convictions for the armed robbery of Curtis Aldridge.

¶37.  The jury instructions for each count of armed robbery mirrored the language of the indictment. As it relates to the conviction for the armed robbery of Curtis Aldridge in Count IV, the jury was instructed that to find Demantreas guilty, it would have to find beyond a reasonable doubt that among other elements, Demantreas, acting in concert with others,

> did unlawfully, willfully and feloniously take and carry away from the person of or from the presence of Curtis Aldridge, U.S. Currency, or any property, the personal property of Club CJ. . . .

As it relates to the conviction in Count III for the armed robbery of Clifton Holmes, the jury was instructed that to find Demantreas guilty, it would have to find beyond a reasonable doubt that among other elements, Demantreas, acting in concert with others,

> did unlawfully, willfully and feloniously take and carry away from the person of or from the presence of Clifton Holmes, certain personal property, to wit: good and lawful U.S. Currency or any property of Clifton Holmes . . . .

¶38.   In *Pope v. State*, 330 So. 3d 409, 428 (¶97) (Miss. Ct. App. 2021), we stated:

> "We employ the *Blockburger* test to determine whether a double-jeopardy
> violation has occurred; it asks whether each offense contains an element not
> present in the other." *McDonald v. State*, 204 So. 3d 780, 782 (¶6) (Miss. Ct.
> App. 2016) (citing *Blockburger v. United States*, 284 U.S. 299 (1932)).
> Multiple convictions of the same felony do not violate the Double Jeopardy
> Clause where each charge was for a separate victim. *Id*. at 783 (¶7). In other
> words, each victim served as an element of one offense not present in the
> other.

¶39.   Further, in *Washington v. State*, 158 So. 3d 1246, 1251 (¶12) (Miss. Ct. App. 2015),

we stated:

> This Court has held that separate offenses, though committed under a common
> nucleus of operative fact, do not present a legal impediment to multiple
> prosecutions under the double jeopardy clause of both the federal and the state
> constitutions.

¶40.   The three armed robbery charges and convictions involved separate victims. The

evidence further shows that they all occurred during a "common nucleus of operative fact."

In any event, the conviction for the armed robbery of Aldridge in Count IV was merged with

the capital murder conviction in Count I. The conviction for the armed robbery of

Washington in Count VI is reversed and rendered as set forth above. Thus, Demantreas has

only one conviction for armed robbery, that being the armed robbery of Clifton Holmes in

Count III. This assignment of error therefore fails.

> **VI.    The trial court did not err by refusing Demantreas' *Milano***
> **instruction.**

¶41.   In *Milano v. State*, 790 So. 2d 179, 185 (¶21) (Miss. 2001), our supreme court adopted

the United Stated Court of Appeals for the Fifth Circuit's Pattern Jury Instruction on aiding

and abetting. On appeal, Demantreas argues that the trial court erred by refusing his version

of the instruction, submitted as D-2, which mirrored exactly the instruction approved in

*Milano.* The trial court refused the instruction because the court found "that instruction is

covered under the State's instruction." The State's version of the *Milano* instruction had

already been accepted by the court without objection from the defense. That instruction,

which was given to the jury as Jury Instruction No. 2, also mirrored the language adopted in

*Milano* except for the last paragraph, which was not included:

> In other words, you may not find any defendant guilty unless you find beyond
> a reasonable doubt that every element of the offense as defined in these
> instructions was committed by some person or persons, and that the defendant
> voluntarily participated in its commission with the intent to violate the law.

*Id.*

¶42.    Concerning our standard of review of a trial court's refusal of an instruction, this

Court stated in *Randolph v. State*, 924 So. 2d 636, 640 (¶14) (Miss. Ct. App. 2006):

> "In determining whether error lies in the granting or refusal of instructions, the
> instructions actually given must be read as a whole. When so read, **if the
> instructions fairly announce the law of the case and create no injustice, no
> reversible error will be found.**" *Johnson v. State*, 823 So. 2d 582, 584 (¶4)
> (Miss. Ct. App. 2002) (quoting *Hickombottom v. State*, 409 So. 2d 1337, 1339
> (Miss.1982)). "In other words, if the instructions taken as a whole fairly, but
> not necessarily perfectly, announce the applicable rules of law, no error
> results." *Milano v. State*, 790 So. 2d 179, 184 (¶14) (Miss. 2001). Defendants
> do not have an absolute right to have their jury instructions granted. "A
> defendant is entitled to have jury instructions given which present his theory
> of the case; however, this entitlement is limited in that the court may refuse an
> instruction which incorrectly states the law, **is fairly covered elsewhere in the
> instructions**, or is without foundation in the evidence." *Heidel v. State*, 587
> So. 2d 835, 842 (Miss. 1991).

(Emphasis added). In *Randolph*, 924 So. 2d at 641 (¶17), we were asked to "adopt a *per se*

rule requiring reversal" if the approved *Milano* instruction is not given in cases involving

20

aiding and abetting in the commission of a crime. In refusing to adopt a per se rule, this Court explained:

> The instruction complained of here is not the same as the one found to be erroneous in *Milano*. The problem with the instruction in *Milano* was that it permitted the jury to find the defendant guilty as an aider or abettor if the defendant "did any act which is an element of the crime." *Milano*, 790 So. 2d at 184 (¶16). Here, the instruction clearly did not instruct the jury in that way.

*Id*. (footnote omitted).

¶43. We find that Jury Instruction No. 2 properly, though perhaps not perfectly, instructed the jury as to the law of aiding and abetting in the commission of a crime. The other instructions, "read as a whole," instructed the jury that the State had the burden to prove each of the elements of each of the offenses charged beyond a reasonable doubt. The omission of the summary paragraph at the end of the *Milano* instruction did not create confusion as to the burden of proof required and was not reversible error.

**CONCLUSION**

¶44. Based on our review, we affirm Demantreas' convictions and sentences as to Count I, Count II, and Count III. His armed robbery conviction in Count VI is reversed and rendered.

¶45. **AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND SMITH, JJ., CONCUR.**